1    Richard M. Heimann (Cal. Bar No. 063607)
     Joy A. Kruse (Cal. Bar No. 142799)
2    Bruce W. Leppla (Cal. Bar No. 071642)
     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
3    275 Battery Street, 29th Floor
     San Francisco, CA 94111-3339
4    Telephone: (415) 956-1000
     Facsimile: (415) 956-1008
5    Email:  rheimann@lchb.com
             jakruse@lchb.com
6            bleppla@lchb.com

7    Michael J. Miarmi
     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
8    250 Hudson Street, 8th Floor
     New York, NY 10013-1413
9    Telephone: (212) 355-9500
     Facsimile: (212) 355-9592
10   Email:  mmiarmi@lchb.com

11   *Attorneys for Plaintiffs*

12

13                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION

14                                    CV 13 3248

15   BIOTECHNOLOGY VALUE FUND, L.P.;        Case No. _____
     BIOTECHNOLOGY VALUE FUND II,
16   L.P.; INVESTMENT 10, L.L.C.; BVF
     INVESTMENTS, L.L.C.;  BVF INC.; and    **COMPLAINT**
17   BVF X, LLC,

18

19            Plaintiffs,

         v.                              **DEMAND FOR JURY TRIAL**
20

21   CELERA CORPORATION; QUEST
     DIAGNOSTICS INCORPORATED; CREDIT
     SUISSE SECURITIES (USA) LLC; KATHY
22   ORDOÑEZ; RICHARD H. AYERS; JEAN-
     LUC BÉLINGARD; WILLIAM G. GREEN;
23   PETER BARTON HUTT; GAIL M.
     NAUGHTON; WAYNE I. ROE; and
24   BENNETT M. SHAPIRO,

25            Defendants.

26

27

28

                                              COMPLAINT
     1121862.1                                CASE NO. _____

Plaintiffs Biotechnology Value Fund, L.P., Biotechnology Value Fund II, L.P., Investment 10, L.L.C., BVF Investments, L.L.C., BVF Inc., and BVF X, LLC (collectively, "BVF" or "Plaintiffs") bring this action against Defendants Celera Corporation ("Celera" or the "Company"), Quest Diagnostics Incorporated ("Quest"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), and the following individuals:  (i) Kathy Ordoñez, Celera's Chief Executive Officer during the relevant period; and (ii) Richard H. Ayers, Jean-Luc Bélingard, William G. Green, Peter Barton Hutt, Gail M. Naughton, Wayne I. Roe, and Bennett M. Shapiro, who served as members of Celera's board of directors during the relevant period (Ordoñez, Ayers, Bélingard, Green, Hutt, Naughton, Roe, and Shapiro are referenced collectively as the "Individual Defendants"; Celera and the Individual Defendants are referenced collectively as the "Celera Defendants").  Plaintiffs' claims are made on information and belief, except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge, based on the investigation conducted by, and under the supervision of, Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Quest's 2011 acquisition of Celera (the "Merger"), which Plaintiffs (through their counsel) obtained from, among other sources:

(i)      publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media);

(ii)      publicly available financial information concerning Celera;

(iii)      filings with the U.S. Securities and Exchange Commission ("SEC") made in connection with the Merger; and

(iv)      publicly filed materials in *In re Celera Corp. Shareholder Litigation*, No. 6304-VCP (Del. Ch.) (the "Delaware Class Proceedings").[1]

---

[1] The Stipulation and Order Governing the Production, Exchange, and Filing of Confidential Material that was entered in the Delaware Class Proceedings ("Confidentiality Order"), which BVF signed onto in participating in the Delaware Class Proceedings, afforded confidential status to certain "Discovery Material"—defined in the Confidentiality Order as "documents, things, depositions, deposition exhibits, interrogatory responses, admissions, and other written, recorded, graphic, or electronic matter or information produced, filed with or submitted to the Court and/or

(Footnote continues on next page.)

-1-

1

## **NATURE OF THE CASE**

2      1.      This case arises from misconduct in connection with Quest's acquisition of Celera,

3  a high-profile biotechnology company that embodied two businesses: (1) a diagnostic business,

4  which was of interest to Quest—a provider of diagnostic testing, information, and other

5  healthcare services to patients and doctors—and (2) a business that generated revenues from

6  royalties, licenses, and milestones, including two royalty assets derived from the licensing of

7  patents on potential blockbuster drugs (referenced collectively in this Complaint as "royalty

8  assets").  While those royalty assets were not generating cashflow at the time of the Merger

9  (consequently, their value was not reflected in Celera's earnings), they were and are highly likely

10  to generate enormous income.  The Merger, which was conceived of and shuttled through by a

11  conflicted CEO, board of directors, and financial advisor, afforded then-existing Celera

12  shareholders—including Plaintiffs, who at the time of the Merger collectively held approximately

13  25% of Celera's outstanding shares—a price representing only a fraction of the Company's true

14  value.

15      2.      The Merger provided Celera shareholders with a mere $8 per share for their Celera

16  stock, shares that had traded well above $16 per share in the months following Celera's debut as

17  an independently traded company under CEO Kathy Ordoñez.  In total, Quest paid slightly more

18  than $680 million to acquire Celera.  As the Company had over $327 million in cash, $117

19  (Footnote continued from previous page.)

20  given or exchanged by and among any parties in the [Delaware Class Proceedings] . . ., including
Discovery Material produced by non-parties to th[e] [Delaware Class Proceedings]."  Conf. Order

21  at p.1 & ¶ 2.  The Confidentiality Order further provides, however, that "[i]n the event that any
Confidential or Highly Confidential Discovery Material is used in any court proceeding in th[e]

22  [Delaware Class Proceedings] or any appeal therefrom, said Confidential or Highly Confidential
Discovery Material shall retain its status as Confidential or Highly Confidential Discovery

23  Material through such use *except* (a) to the extent ordered otherwise by the Court or (b) *to the
extent such Discovery Material becomes part of the public record in the [Delaware Class*

24  *Proceedings]."  Id.* ¶ 21 (emphasis added).  BVF has, in accordance with the Confidentiality
Order, limited its reliance on, and references in this Complaint to, materials produced or

25  otherwise exchanged in the Delaware Class Proceedings only "to the extent" those materials

26  became "part of the public record" in those Proceedings, i.e., to the extent they were referenced in
documents that are publicly available through the Delaware courts' electronic dockets or in those

27  courts' opinions.

28

1  million in tax credits, and no debt on its books, however, the implied value of Celera's operating

2  assets reflected in Quest's offer was closer to $236 million ($680 – ($327 + $117) = $236).

3  While $236 million was inadequate even merely considering Celera's diagnostics business, which

4  alone generated revenue of $150 million—indeed, just a few years earlier, in October 2007,

5  Celera purchased a lab business, Berkeley HeartLab, Inc., for approximately $195 million—it

6  grossly undervalued the Company's royalty assets. Those assets principally derived from two

7  potentially blockbuster drugs in late-stage development: (i) odanacatib ("Cat-K"), an

8  osteoporosis drug being developed by Merck, which was in Phase III trials; and (ii) ibrutinib, one

9  of the most promising cancer drugs ever discovered, which was under development by

10  Pharmacyclics, Inc.—by the time the Merger was consummated, ibrutinib had already saved

11  scores of lives from cancer.

12       3.     The Celera Defendants, with the material assistance of Credit Suisse and Quest,

13  entered into the Merger despite knowing that (i) selling the entire Company, without spinning off,

14  or otherwise garnering separate value for, its royalty assets, would result in a sale price that

15  significantly undervalued those assets; (ii) the $8-per-share sale price in fact was far from

16  adequate, primarily given that the value of the royalty assets alone merited a price of a multiple of

17  $8 per share; (iii) the potential acquirers of Celera, including Quest, either did not appreciate,

18  were not told of, or disregarded, the royalty assets' true value; and (iv) a significant bloc of Celera

19  shareholders, including BVF—which, unlike the Celera Defendants, had extensive experience

20  valuing drug-royalty assets—strongly opposed having the Company consummate a deal that did

21  not maximize the value of its royalty assets.

22       4.     Celera's royalty assets were, and still are, worth billions of dollars, representing a

23  significant multiple of the price Quest paid for the Company. In that regard, Pharmacyclics'

24  current market capitalization, which derives in significant part from that company's economic

25  interest in ibrutinib, is approximately $7.36 billion.

26       5.     Additionally, after its acquisition of Celera, Quest added $386 million—nearly

27  150% of the "implied value" Quest paid for all of the Company—to its market capitalization in

28

     -3-     

just a single day as a result of news regarding Cat-K. On July 12, 2012, *The Wall Street Journal* reported, under the headline "Quest Diagnostics Shares Up on Merck News":

> Goldman Sachs notes Quest Diagnostics (DGX) stands to benefit from Merck's (MRK) plan to close a clinical study of experimental osteoporosis drug odanacatib [Cat-K] earlier than expected because of its success in preventing hip fractures. DGX holds mid- to high-single-digit royalties on future sales of the drug through 2023, Goldman says, which it estimates could raise per-share earnings as much as 39 cents at a 2017 peak. The firm believes investors have forgotten these and other royalties that DGX has held since last year's acquisition of Celera. DGX told Goldman it makes no assumptions on future royalties linked to Celera, but investors are sending shares of the diagnostic-testing company up 4.6% to $63.57 on heavy volume.

6.      During an in-person meeting with BVF executives in January 2011, Celera's Chief Financial Officer Alfred Merriweather acknowledged that a sale of the entire Company likely would not afford full value for the royalty assets. Merriweather further stated it likely made sense not to include those assets in a deal for the Company. In a previous meeting with BVF executives, Chairman William Green pledged to preserve the value of the royalty assets for shareholders. Nevertheless, Ordoñez and the other Individual Defendants, with Credit Suisse's assistance, essentially gave those assets away to Quest, in exchange for their own personal financial benefit.

7.      Far from innocently undervaluing Celera, Defendants subverted shareholders' best interests in favor of their own, in several respects.

8.      First, Ordoñez was under significant pressure from many constituents and, had the sale to Quest not materialized, would have likely been terminated and would have forgone a multi-million dollar payout and lucrative employment guarantee from Quest. As detailed below, Ordoñez's position as CEO was in serious jeopardy, as even the Celera Board began to criticize her performance and doubt whether she could lead the Company. Shareholders began demanding changes that would maximize the value of Celera's resources, including its royalty assets, and were preparing to challenge Ordoñez's reelection as a director, which she knew.

9.      Accordingly, in purporting to assess potential strategic transactions for Celera and in negotiating with Quest in her capacity as Celera's CEO, Ordoñez breached her fiduciary duties of due care and loyalty by negotiating a sale at any price with the aim of obtaining for herself the

1  most lucrative and secure post-merger employment agreement with Quest possible, rather than

2  the best deal price for Celera shareholders.

3          10.     Second, Credit Suisse breached its fiduciary duties of due care and loyalty to

4  Celera shareholders, and aided and abetted other Defendants' breaches of their fiduciary duties,

5  by knowingly, recklessly, or negligently manipulating material information regarding the value of

6  Celera's drug royalties to justify the inadequate sale price and earn a multi-million dollar

7  contingent fee that was payable only if Celera consummated a transaction involving the sale of

8  the entire Company or at least the majority of its assets, but not if some other strategy were

9  pursued.

10          11.     In addition to its breaches of fiduciary duty and aiding and abetting others'

11  breaches, Credit Suisse violated Section 14(e) of the Securities Exchange Act of 1934

12  ("Exchange Act") due to the misstatements or omissions regarding its royalty projections that

13  were included in the Schedule 14D-9 Solicitation/Recommendation Statement

14  ("Recommendation Statement") issued in connection with Quest's tender offer (the "Tender

15  Offer").

16          12.     Third, Ordoñez and the other Individual Defendants, in their capacity as members

17  of the Celera Board, breached their duties of due care and loyalty by failing to maximize

18  shareholder value in accepting Quest's meager $8-per-share final offer. Among other things, the

19  Individual Defendants implemented a rushed process for seeking potential transactions, such as

20  by incorporating provisions designed to ensure the consummation of a deal at any cost to Celera

21  shareholders rather than obtain the best possible deal—which they were obligated to do—in

22  exchange for lucrative individual compensation and six years of legal indemnification for past

23  wrongdoing, including accounting fraud that is the subject of pending federal securities and

24  derivative litigation in this District. The Celera Board never seriously pursued the one clear

25  value-maximizing option: to spin out, or otherwise segregate, the Company's royalty assets apart

26  from the sale of its diagnostic business. Additionally, the Board abdicated to Credit Suisse its

27  duty to oversee the merger process and allowed Ordoñez, whose job was in jeopardy and who

28

1    suffered from a debilitating conflict of interest, to lead negotiations with Quest on Celera's

2    behalf.

3        13.    Fourth, through the actions of its CEO and Board, Celera violated Section 14(e) of

4    the Exchange Act by issuing the materially false or misleading Recommendation Statement,

5    which misstated or omitted material information regarding Credit Suisse's valuation of Celera's

6    royalty assets as well as Celera's purported efforts to seek a potential transaction other than a sale

7    of the whole Company.

8        14.    Fifth, Quest, whose only interest in the sale was to pay the lowest amount possible

9    to acquire Celera, knowingly facilitated the other Defendants' misconduct by, among other

10   things:  (i) negotiating almost exclusively with Ordoñez despite knowing she was conflicted due

11   to her significant financial interest in consummating a transaction with Quest; (ii) working with

12   Ordoñez to convince the Individual Defendants to accept Quest's $8-per-share offer without

13   conducting a market check or considering alternatives, such as selling the Company in segments

14   or issuing contingent-value rights; (iii) constructing deal-protection devices that prevented the

15   Individual Defendants from fully informing themselves of potential alternatives that could

16   provide greater value to Celera shareholders; and (iv) affording the Individual Defendants six

17   years of indemnification for misconduct while at the Company, despite the pendency of securities

18   litigation accusing certain Defendants of accounting fraud.

19       15.    Due to its large stake in Celera when the Merger was consummated, BVF suffered

20   hundreds of millions, if not billions, of dollars in damages as a result of Defendants' misconduct.

21       16.    BVF was not alone in deeming the Merger price insufficient.  Soon after the

22   Merger was announced, shareholders filed putative class actions seeking to enjoin the Celera

23   Defendants from consummating it.  In the Delaware Class Proceedings, for example, lead

24   plaintiff New Orleans Employees' Retirement System ("NOERS") alleged, on behalf of itself

25

26

27

28

1    and all other similarly situated public shareholders of Celera, that the Merger consideration was

2    "grossly inadequate," as it failed to "account for the Company's future performance."[2]

3        17.    Shortly after filing suit, however, NOERS, which had engaged in a "careless and

4    cavalier sale of all of its stock in Celera" a few days before the Merger was consummated,[3]

5    hastily agreed to a settlement affording no additional monetary consideration to Celera

6    shareholders while forcing class members to give up all claims (both monetary and non-

7    monetary) against the defendants.

8        18.    Despite deeming NOERS "only barely" an appropriate class representative, the

9    Delaware Chancery Court (i) certified the class, appointing NOERS as class representative; (ii)

10   denied BVF's request to certify the class only on an opt-out basis; (iii) approved the settlement as

11   fair and reasonable; and (iv) awarded $1.35 million in attorneys' fees (including reimbursement

12   for expenses) to plaintiffs' counsel.[4]

13       19.    BVF then appealed to the Delaware Supreme Court, which upheld the Chancery

14   Court's certification of the class and appointment of NOERS as class representative but

15   determined that the Chancery Court abused its discretion in declining to provide an opt-out right

16   to BVF.[5]  The Supreme Court explained that because "the class representative was 'barely'

17   adequate, the objector [BVF] was a significant shareholder prepared independently to prosecute *a*

18   *clearly identified and supportable claim for substantial money damages*, and the only claims

19   realistically being settled at the time of the certification hearing nearly a year after the merger

20   were for money damages," the Chancery Court "had to provide an opt-out right."[6]

---

[2] Verified Consolidated Amended Class Action Complaint in Delaware Class Proceedings ¶¶ 46,
48.

[3] *In re Celera Corp. S'holder Litig.*, No. 6304-VCP, 2012 Del. Ch. LEXIS 66, at *5-6, *127 (Del.
Ch. Mar. 23, 2012) ("*Celera I*"), *aff'd in part and rev'd in part*, 59 A.3d 418 (Del. 2012) ("*Celera
II*").

[4] *Id.* at *5-6, *127.

[5] *See Celera II*, 59 A.3d at 436-37.

[6] *Id.* at 436 (emphasis added) (quoting *Celera I*, 2012 Del. Ch. LEXIS 66, at *5).

20.    BVF thus brings this opt-out action after mounting a challenge to the rushed and ineffectual settlement in the Delaware Class Proceedings in which NOERS and the defendants attempted to preclude BVF from opting out and thus bind it to a settlement to which it had vigorously objected.  BVF seeks, through this action, to pursue its "clearly identified and supportable claim[s] for substantial money damages."

**THE PARTIES**

**Plaintiffs**

21.    Plaintiffs are affiliated entities engaged in the business of investing in biotechnology companies.

22.    Plaintiff Biotechnology Value Fund, L.P., based in San Francisco, California, is a private investment firm established in 1993.

23.    Plaintiff Biotechnology Value Fund II, L.P. is a Delaware limited partnership formed in 1999.

24.    Plaintiff Investment 10, L.L.C. is an Illinois limited liability company formed in 1994.

25.    Plaintiff BVF Investments, L.L.C. is a Delaware limited liability company formed in 2000.

26.    Plaintiff BVF Inc. is a Delaware corporation formed in 1993.

27.    Plaintiff BVF X, LLC is a Delaware limited liability company formed in 2009.

28.    At the time of the Merger, Plaintiffs collectively owned more than 19 million shares of Celera, representing nearly 25% of all shares outstanding (before accounting for the shares issued to Quest pursuant to the "Top Up Option" included in the Quest-Celera merger agreement (the "Merger Agreement")).

**Defendants**

29.    Defendant Celera Corporation, a Delaware corporation with headquarters in Alameda, California, is a healthcare business focusing on the integration of genetic testing into routine clinical care through a combination of products and services.  Founded in 1998, Celera "uses knowledge of human variability to provide new tests and services to personalize disease

1    management."[7]  Celera is the survivor of a merger with a wholly-owned subsidiary of Quest

2    (Spark Acquisition Corp.) formed for the purpose of acquiring the Company and continues to

3    operate as a wholly-owned subsidiary of Quest.  Before the Merger, Celera's shares traded on the

4    NASDAQ Stock Market.

5           30.     Defendant Quest Diagnostics Incorporated, a Delaware corporation with

6    headquarters in Madison, New Jersey, is a provider of diagnostic testing, information, and other

7    healthcare services to patients and doctors.  Quest's stock trades on the New York Stock

8    Exchange.

9           31.     Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability

10    company with headquarters in New York, New York.  Credit Suisse provides, among other

11    things, private banking, wealth management, and investment-banking services.

12          32.     Defendant Kathy P. Ordoñez, a citizen of California, became a director and CEO

13    of Celera in February 2008 and served in both of those capacities at all times relevant to this

14    action.

15          33.     Defendant Richard H. Ayers, a citizen of Florida, became a director of Celera in

16    February 2008 and served as chairman of the Company's Finance Committee.  Ayers served as a

17    Celera director at all times relevant to this action.

18          34.     Defendant Jean-Luc Bélingard became a director of Celera in February 2008 and

19    served in that capacity at all times relevant to this action.  Bélingard is a citizen of France and has

20    a residence in New York, New York (at least as of December 2012).

21          35.     Defendant William G. Green, a citizen of California, became a director of Celera

22    in February 2008 and was appointed Chairman of the Board in July 2008; he served in that

23    capacity at all times relevant to this action.

24          36.     Defendant Peter Barton Hutt, a citizen of Virginia, became a director of Celera in

25    August 2008 and served in that capacity at all times relevant to this action.

26

27    [7] https://www.celera.com/celera/about, last visited on July 12, 2013.

28

1        37.    Defendant Gail K. Naughton, a citizen of California, became a director of Celera

2  in mid-2008 and served in that capacity at all times relevant to this action.

3        38.    Defendant Wayne I. Roe, a citizen of Maryland, became a director of Celera in

4  December 2008 and served in that capacity at all times relevant to this action.

5        39.    Defendant Bennett M. Shapiro, a citizen of Pennsylvania, became a director of

6  Celera in May 2008 and served in that capacity at all times relevant to this action.

7        40.    Defendants Ordoñez, Ayers, Bélingard, Green, Hutt, Naughton, Roe, and Shapiro

8  were the members of the Celera Board who agreed to sell the Company to Quest.

## JURISDICTION AND VENUE

10        41.    This Court has jurisdiction over the subject matter of this action in accordance

11  with Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. The Court may

12  exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367, over Plaintiffs' state-law

13  claims.

14        42.    This Court has personal jurisdiction over all of the Defendants by virtue of their

15  business activities in this jurisdiction.

16        43.    Venue is proper in the Northern District of California under Section 27 of the

17  Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391(b), (c), and (d). Each

18  Defendant transacted business in this District and a substantial part of the events or omissions

19  giving rise to Plaintiffs' claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

21        44.    This action arises in substantial part in Alameda County, where Celera's

22  headquarters were (and still are) located, and in San Francisco County, where Plaintiff

23  Biotechnology Value Fund, L.P. resides. Accordingly, as contemplated by Rule 3.2(c) of this

24  Court's Civil Local Rules, "a substantial part of the events or omissions which give rise to

25  [Plaintiffs'] claim[s] occurred" in Alameda County and in San Francisco County. This case

26  therefore should be assigned to the San Francisco Division of this Court.

## FACTS COMMON TO ALL CLAIMS

**A.    A Conflicted CEO, Board, and Financial Advisor Sacrificed Shareholders' Best Interests for Personal Gain.**

      **1.    After deciding to consider potential strategic transactions, the Celera Board retained Credit Suisse and incentivized it to consummate a sale of the entire Company regardless of whether such a sale would maximize value for Celera shareholders.**

45.    Before its acquisition by Quest, Celera—the high-profile Company that first sequenced the human genome—was a market leader in genetic testing with internally developed and patented discoveries that would provide the Company with current and future value and growth.  At the time of the Merger, Celera's core business operations were conducted through three primary units: (i) Lab Services, which mainly provided genetic testing; (ii) Products, which sold testing kits approved by the U.S. Food and Drug Administration ("FDA"); and (iii) Corporate, which held intellectual property and royalty rights for drug compounds under development by other companies.  Among the latter were Cat-K, which was in Phase III trials, and ibrutinib, one of the most promising cancer drugs ever discovered, which was under development by Pharmacyclics (and now also by Johnson & Johnson).

46.    In October 2009, Celera's management recommended that the Celera Board consider potential strategic transactions, such as commercial partnerships.

47.    On February 3 and 4, 2010, the Board directed senior management and its financial advisor, Credit Suisse, to analyze the Company's strategic alternatives.  Celera negotiated and signed a formal engagement letter with Credit Suisse in March 2010.

48.    The engagement agreement provided that Credit Suisse would receive an upfront payment of $250,000.  Any further compensation was contingent on a sale of 50% or more of the Company: specifically, Credit Suisse would get $1 million to prepare a fairness opinion and 1.3% of the total transaction value of any such deal (referenced collectively in this Complaint as the "Sale Bonus").

49.    Credit Suisse thus had a strong financial incentive to push for a sale of the entire Company—which, as detailed below, it did.

-11-

50. Throughout its engagement, Credit Suisse continually discouraged the Celera Board from pursuing alternatives to a sale of the entire Company. During a meeting of the Celera Board on March 29, 2010, for example, Credit Suisse recommended that Celera solicit bids only for "an acquisition of the entire Company" rather than simultaneously seek "partnerships or other collaborations between Celera and third parties," which Credit Suisse claimed would "complicate the process." When a Board member suggested approaching some companies with partnership proposals and others with acquisition proposals, Credit Suisse strongly advised against that approach. The Celera Board thus agreed to forgo efforts to seek alternatives to a sale of the entire Company, instead handing over the reins to Credit Suisse, which had a significant incentive to encourage such a sale, and to Celera's CEO Kathy Ordoñez, who, as detailed below, was also conflicted.

### 2. Credit Suisse and Ordoñez ran a flawed sale process.

51. In the first few months of seeking a potential strategic transaction for Celera, Credit Suisse and Ordoñez contacted a mere nine potential bidders, four of whom were not interested in considering a transaction. Moreover, none of the bidders Credit Suisse identified were in the business of valuing passive royalty assets or in a position to bid separately for those assets. It is unclear if the bidders were even aware Celera possessed those assets.

52. The Board also never sought a bid for the royalty assets from potentially viable bidders that the Board knew, or should have known, had a strong interest in those assets, including Merck, Pharmacyclics, and BVF.

53. Additionally, when Board members suggested to Credit Suisse the names of additional potential bidders, Credit Suisse brushed their suggestions aside, assuring them during the March 29, 2010 Board meeting that contacting additional bidders would not be necessary.

54. Each of the five remaining bidders was required to sign a confidentiality agreement containing, among other things, a standstill provision. The standstill provision mandated that, for a period of time ranging from one to two years, the bidder could only seek to acquire the stock or assets of Celera if the Celera Board specifically invited the bidder to make an offer. The provision also precluded potential intervening bids once the Board selected a favored

merger partner, and it expressly prohibited the signing parties from even asking the Board to waive the restrictions to allow for a superior proposal.

55. In March and April 2010, Celera management made presentations to the remaining five potential bidders, including Quest.

56. In mid-April 2010, Celera received a preliminary bid from Quest to acquire the Company at $10.00 or more per share. Celera received an offer from a second bidder for $8.50 to $9.50 per share. A third bidder offered to acquire Celera's Products business for $50-$65 million, and a fourth similarly expressed interest in acquiring that business. On May 4, 2010, the second bidder increased its offer to $9.00-$11.00 per share, and Credit Suisse invited Quest and that bidder to participate in a second round of bidding.

### 3. After Quest submitted its bid, Celera formed, but failed to empower, a special committee of the Board.

57. On May 21, 2010, Quest submitted a formal bid of $10.00 per share to acquire Celera. The bid was conditioned upon the execution of employment agreements with key employees, including Ordoñez. That same day, the second bidder referenced above stated it would not proceed further because of concerns that Celera was too complex to acquire as a whole entity.

58. Neither Celera nor Credit Suisse meaningfully attempted to determine whether the second bidder, or other bidders, would be interested in alternative transactions, such as a sale of part of the Company that would leave the royalty assets with shareholders. Moreover, the standstill provision precluded potential bidders from initiating any such proposals.

59. On May 25, 2010, the Celera Board appointed a special committee (the "Special Committee"), consisting of directors William Green and Richard Ayers, to oversee negotiations with Quest. Ayers testified in the Delaware Class Proceedings, however, that the Special Committee had no duties or responsibilities with respect to dealing with potential acquirers.[8] Instead, the Celera Board deferred its negotiation responsibilities to Ordoñez, despite the Board's

---

[8] *See, e.g., Celera I*, 2012 Del. Ch. LEXIS 66, at *92-93.

concerns about her shortcomings as CEO and despite knowing she suffered from a disqualifying conflict of interest relating to her expectations of future, lucrative employment with Quest.

### 4. Ordoñez's unreasonable compensation demands caused Quest to withdraw its $10.25-per-share offer.

60. On June 23, 2010, having completed due diligence, Quest remained willing to proceed at $10.00 per share to acquire Celera. In analyzing the adequacy of Quest's offer and whether it fully valued the Company's royalty assets, the Special Committee internally noted a "value gap" between Quest's view of the value of Cat-K and "how other parties might view the asset." The Board nonetheless did virtually nothing to change Quest's misperception.

61. On June 25, 2010, Quest increased its offer to $10.25 per share, again contingent on reaching satisfactory employment agreements with key employees, including Ordoñez. At that time, however, Ordoñez was dissatisfied with Quest's proposal regarding her compensation and post-acquisition position as a Senior Vice President at Quest. On or before June 29, 2010, Quest recognized internally that Ordoñez was unwilling to accept the terms of employment Quest had offered to her, and Quest concluded that her demands—including a $3.4 million change-in-control payment in connection with the acquisition—were unacceptable.

62. On June 30, 2010, Quest withdrew its offer, citing its "concerns regarding retention of the Company's management following consummation of the proposed transaction."[9] Quest also claimed to have concern regarding the potential effect of a then-unpublished paper regarding "KIF6," a gene variance, on Celera's KIF6-related products. Quest never disclosed how it obtained knowledge of the paper before its publication. Nor did Quest ever disclose that the paper, which ultimately was published, was authored by one of Quest's own scientific advisors.

---

[9] Recommendation Statement (Schedule 14D-9 Solicitation/Recommendation Statement under Section 14(d)(4) of the Exchange Act), Mar. 28, 2011, at 17.

COMPLAINT
CASE NO. _____

63.     As reflected in the Celera Board's books, after Quest withdrew its $10.25 offer, shareholders began to voice their desire for a clear statement from Celera about its plan going forward, given "the perception that the strategic partnering process did not bear fruit."

64.     Against that backdrop, Credit Suisse returned to the Celera Board on August 19, 2010 to present a "review of alternatives." Once again, however, Credit Suisse disregarded other strategic options available to Celera and instead pushed for a sale of the entire Company.

65.     From August to October 2010, representatives of Celera had sporadic contact with a few potential bidders, one of whom expressed an interest in acquiring Celera's products business for $125 to $165 million. Another, newly contacted, bidder expressed initial interest in the Company's Lab Services segment, but withdrew its interest in a proposed strategic transaction in December 2010 for reasons Celera did not disclose. Given Credit Suisse's financial interest in a sale of the entire Company rather than a strategic option involving only a portion of Celera's assets, Credit Suisse—which had significant control over the process of finding potential bidders—did not sufficiently explore those offers.

66.     In an October 1, 2010 e-mail to Defendant William Green, Ordoñez anticipated Quest would "come back with a low ball offer for the whole company after the KIF6 paper issues and we issue quarterly results."

67.     On October 7, 2010, the KIF6 analysis and a critical editorial were published. Celera immediately responded by publicly refuting the methodologies employed in the study and representing that the study would not impact the Company's financial performance.

68.     As Ordoñez had predicted, on November 22, 2010 Quest returned with a "low ball" offer of $7 per share. After the Celera Board rejected the offer, Quest discontinued negotiations.

### 5.     Fearing the loss of her job, Ordoñez worked to push through a sale of the Company to Quest.

69.     When negotiations with Quest stalled, rather than consider alternative transactions or partnerships, Ordoñez devised a new business plan to justify a deal with Quest. In early December 2010, Ordoñez developed a going-forward plan for Celera that entailed significant cuts

1  in personnel and research, which both Celera and Credit Suisse recognized would increase

2  Celera's near-term profitability while, on paper, sacrificing long-term value.

3        70.    Although Celera never fully implemented the drastic changes in personnel and

4  research contemplated by Ordoñez's new business plan, Credit Suisse ultimately used the slashed

5  projections resulting from that plan to support its fairness analysis of Quest's final offer of $8 per

6  share and the financial and valuation information provided to Celera shareholders. But because

7  those projections were based on Celera continuing as a standalone entity rather than being

8  involved in a transaction with Quest or another company, they were inappropriate for use in

9  determining an offer price.

10        71.    Furthermore, with Ordoñez's business plan lurking in the background in the event

11  Celera shareholders rejected Quest's Tender Offer, investors were forced to choose between

12  tendering to Quest at an inadequate price or facing Ordoñez's artificially manufactured slash-and-

13  burn scenario.

14        72.    Additionally, Ordoñez's fear over mounting criticism of her performance as CEO,

15  and the prospect that her position on the Board was in jeopardy, further motivated her to pursue a

16  deal with Quest that would secure her a well-compensated position as a senior executive of the

17  combined entity.

18        73.    In that regard, at the end of 2010 and beginning of 2011, director William Green

19  led the Celera Board in assessing Ordoñez's performance, which included interviewing the other

20  directors. Green's notes from those interviews indicate increasing dissatisfaction among Board

21  members regarding Ordoñez's performance as CEO, including her previous failure to adequately

22  communicate with the Board.

23        74.    Ordoñez also faced the dissatisfaction of Celera shareholders who were frustrated

24  by her continued failure to maximize the Company's value, particularly with respect to its

25  lucrative royalty assets. On more than one occasion, Ordoñez conveyed to other members of the

26  Celera Board her concerns about investors' discontent, including in a February 5, 2011 e-mail to

27  Green.

28

-16-

75.     On February 25, 2011, a large Celera shareholder, Starboard Value & Opportunity Fund (formerly known as Ramius Value & Opportunity Fund) ("Starboard"), submitted a Notice of Stockholder Nomination (the "Nomination") for the election of two directors at the Company's upcoming 2011 annual meeting.  As Ordoñez and Green were up for reelection at that meeting, Starboard's nomination constituted a direct challenge to them.

76.     In a letter to Ordoñez delivered on or around April 7, 2011, Starboard explained that it had submitted its Nomination "because we felt there were significant opportunities to improve the fundamental performance of Celera and that changes to the composition of the Board of Directors . . . were warranted given the Company's historical performance."

77.     Referring to Celera's announcement, after the Nomination, of the sale of the Company to Quest for $8 per share, Starboard expressed concern "that during the sale process a key driver of value was overlooked."  Noting it had "reviewed the publicly available information regarding the merger with Quest," as well as "the publicly-filed letters exchanged between Biotechnology Value Fund, L.P., [then] a 12% shareholder of Celera, and Surya N. Mohapatra, Ph.D., Chairman and Chief Executive Officer of Quest," Starboard stated "it does not appear that the Company fully evaluated opportunities to monetize the value of the Company's royalty interests, particularly the royalty associated with Merck's Odanacatib [Cat-K], a phase III drug for the treatment of Osteoporosis."  Starboard further observed, "It also does not appear that owning pharmaceutical royalty interests is a core competency for Quest or a strategic rationale for its acquisition of Celera."  Accordingly, Starboard explained, "it is our belief that the value of this asset may not be fully reflected in the value of the proposed Quest transaction."

78.     Starboard thus "urge[d] the Company to reengage with Quest specifically regarding the Company's royalty interests so that shareholders may be presented with a transaction to consider that properly and adequately values the Company," further noting "[w]e are open minded to alternative transaction structures that would allow shareholders of Celera to retain an interest in these royalties and are not opposed to a combination with Quest on the right terms and conditions."

79.     Further enhancing Ordoñez's (and other Defendants') desire to sell the Company, on June 14, 2010, a putative class action was filed in this District against Celera, Ordoñez, and others, asserting claims under Sections 10(b) and 20(a) of the Exchange Act. The plaintiffs alleged that from April 2008 through July 2009, the defendants set inadequate allowances for doubtful accounts, concealed the extent to which Celera's accounts receivable were impaired, and made other false and misleading statements regarding Celera's business and financial results. Similar lawsuits were filed in this District on July 2 and July 9, 2010.

80.     By early 2011, facing possible termination as CEO, shareholder unrest, the potential loss of her seat on the Celera Board, and pending securities litigation, Ordoñez aggressively pursued a sale of the Company—regardless of whether such a deal was in shareholders' best interests—and simultaneously sought to negotiate a multi-million dollar payout and continued employment for herself.

81.     On January 3, 2011, Ordoñez redoubled her efforts to force through a sale to Quest by reaching out to its CEO Surya Mohapatra. When Quest expressed a willingness to reengage, the Celera Board agreed to defer to Ordoñez virtually all responsibility for negotiations—despite the Board's concerns about her shortcomings as CEO. Other than engaging in a single visit and follow-up call with William Green in February 2011, Mohapatra negotiated exclusively with Ordoñez.

82.     Ordoñez warned Quest that the other members of the Celera Board might be hesitant to approve a sale of the Company to Quest. But Ordoñez ultimately succeeded in persuading the Board to proceed exclusively with Quest. Moreover, when Green suggested proposing a deal to Quest that would afford shareholders contingent-value rights with respect to Celera's royalty assets, Ordoñez expressed concern that it would slow down the deal and acted quickly and unilaterally to end discussion on the issue. Ordoñez was expressing the exact opposite view during private meetings with representatives of BVF.

**6.     As negotiations with Quest continued, Celera, in consultation with PricewaterhouseCoopers LLC, faced the looming prospect—which ultimately materialized—of restating previously issued financial results.**

83.     On January 5, 2011, a representative of Celera's accounting firm, PricewaterhouseCoopers LLC ("PWC"), raised a question as to whether certain amounts previously included as bad-debt expenses as a component of selling, general, and administrative expenses should be classified as a reduction in revenues. Celera began collecting the necessary data to assess the impact such a reclassification would have on the Company's historical financial information.

84.     While Celera was dealing with those issues regarding its previous financial results, on January 27, 2011, Quest offered to acquire the Company for $7.75 per share. Quest indicated it disfavored a transaction involving contingent-value rights or any other transaction that separately valued Celera's royalty assets. Ordoñez acquiesced, asking merely that Quest raise its offer to $8.25 per share.

85.     Ordoñez declined to push for a transaction that would incorporate contingent-value rights or separately value Celera's royalty assets, despite knowing that BVF—one of the Company's largest shareholders—and other investors favored such a transaction and despite having previously expressed to Credit Suisse's George Boutros (in a January 19, 2011 e-mail) "the need to separate the drug assets":

> We must pare out the drug assets! I will not negotiate with them, but leave that to you. If an offer comes to you, pls bear in mind the need to separate the drug assets. We met with BVF this morning and they will work to stop any blanket deal that sweeps in the drug assets. They are not alone on the investor side.

86.     On February 4, 2011, Celera's Audit Committee (along with certain other members of the Celera Board) met with Celera management and representatives of PWC to review the reclassification issue. While acknowledging that some revision to Celera's historical financial information might be necessary, management indicated (wrongly, as it turned out) that a restatement likely would not be warranted. As management and PWC continued to consider the issue, the Board and management grew more anxious to sell the Company.

87.     While Quest and Ordoñez were negotiating, PWC advised the Company that it would be reviewing the timing of a bad-debt charge originally recorded in the second fiscal quarter of 2009 and assessing whether all or a portion of the charge should be recorded in prior periods.  PWC also indicated that, contrary to Celera management's previously stated expectation, the reclassification issue might require a restatement of certain historical financial information.

88.     On February 17, 2011, Quest made its purported "best and final offer" of $8 per share.

89.     As discussed above, on February 25, 2011, Starboard notified Celera that it intended to oust Ordoñez and Green from the Board.

90.     As noted above, although $8 per share amounted to a total price for Celera of $680 million, the Company had no debt on its books, more than $327 million in cash, and an additional $117 million in tax credits.  Accordingly, the $8-per-share offer valued Celera's core business operations and drug royalties at $236 million.  In fact, the core business operations alone were worth at least that much and the royalty assets were worth many times that amount.

91.     On March 14, 2011, PWC advised Celera that the bad-debt timing issue would require a restatement.  Celera ultimately agreed.

**B.      Credit Suisse Provided an Erroneous Analysis of Quest's Offer, Substantially Undervaluing Celera's Royalty Assets and Thereby "Supporting" Credit Suisse's Fairness Opinion for the Merger.**

92.     To support the Merger—which, if consummated, would allow Credit Suisse to obtain its significant Sale Bonus—Credit Suisse provided the Celera Board with a valuation analysis that, due to numerous material errors, significantly undervalued Celera's royalty assets, resulting in an unduly low valuation of the Company.

93.     Although the Celera Board knew Credit Suisse had a self-interested motivation to ensure a sale of the entire Company, the Board deferred entirely to Credit Suisse and its analysis to justify accepting Quest's $8-per-share offer—even after it was apparent to Ordoñez and others that, as detailed below, Credit Suisse's analysis was erroneous.

94. The value of drugs under development and royalty rights associated with those drugs is often assessed by estimating the potential cash flow a drug will generate if it is approved by the FDA and reaches the market and discounting that value to account for the possibility the drug will not be approved.

95. In performing its valuation of Celera's royalty assets, including with respect to Cat-K, in connection with Quest's $8-per-share offer in early 2011, Credit Suisse relied on a single study published in 2002 by the Milken Institute based largely on data collected by the Tufts University Center for the Study of Drug Development (the "Tufts Study").[10]

96. The Tufts Study posits that "[t]he incorporation of clinical-trial success rates into more traditional financial analyses can be used to price the current values of biotech projects as they are being developed."[11] In particular, the Study explains, "clinical-trial success rates can be combined with traditional discounted cash flow (DCF) methodology to yield a risk-adjusted net present value (rNPV) for biotechnologies."[12]

97. The Tufts Study provides a set of general probabilities with respect to whether a drug in development will ultimately reach the market, based on the various stages of development: (i) for Phase I trials – 20%; (ii) for Phase II trials – 30%; (iii) for Phase III trials – 67%; and (iv) for FDA New Molecular Entity ("NME") approval – 81%.[13]

98. As an initial matter, Credit Suisse's blind use of the probability figures presented in the Tufts Study was inappropriate in valuing Celera's royalty assets, as Credit Suisse merely applied the Study's generic probability numbers without taking into account the compelling characteristics of the specific drugs underlying Celera's royalty rights, which make them far more likely to reach market than the average drug used in the Tufts Study. On July 10, 2013,

---

[10] Jeffrey J. Stewart, *Policy Brief: Biotechnology Valuations for the 21st Century*, Milken Institute, Apr. 2002.

[11] *Id.* at 3.

[12] *Id.*

[13] *Id.*

COMPLAINT
CASE NO. _____

1    Pharmacyclics announced it had submitted the first New Drug Application (NDA) to the FDA for

2    ibrutinib.

3         99.    In that regard, as noted earlier, Cat-K was (and is) being developed by Merck, one

4    of the largest pharmaceutical companies in the world, which had invested enormous resources

5    into trials of the drug in preparation for seeking FDA approval.  Indeed, during the past few years,

6    Merck has been running an extraordinary Phase III Cat-K study involving 17,000 patients.

7    Merck's decision to invest extensively in Cat-K reflects Merck's own high assessment of the risk-

8    adjusted present value of the drug.

9         100.   A proper valuation of potential royalties from Cat-K would account for those

10   circumstances, which render Cat-K more likely to attain FDA approval and enhance the drug's

11   prospects for producing larger royalties than was the generic example on which the Tufts Study is

12   based.

13        101.   The Celera Board, which had eschewed its responsibility to properly oversee

14   Credit Suisse, did not question Credit Suisse's failure to incorporate asset-specific considerations

15   into its valuation analysis.

16        102.   Moreover, even notwithstanding the general inappropriateness of using the Tufts

17   Study's probability figures as a valuation measure for Celera's royalty assets without

18   incorporating considerations specific to Celera's particularly valuable assets, Credit Suisse

19   committed serious errors in actually employing the Study.

20        103.   For example, while the projected cash flows for a Pharmacyclics drug in Phase I

21   should have been multiplied by 0.20 based on the Tufts Study's conclusion that 20% of Phase I

22   drugs eventually reach market, Credit Suisse multiplied the projected cash flows by 0.03 (or 3%),

23   the cumulative product of the four individual probability rates identified in the Tufts Study (0.03

24   $= 0.20 \times 0.30 \times 0.67 \times 0.81$).  As a result, instead of valuing the Pharmacyclics drugs using the

25   Tuft Study's actual probability adjustments (Phase I – 20%; Phase II – 30%; Phase III – 67%; and

26   FDA NME – 81%), Credit Suisse erroneously used the following adjustments:  Phase I – 3%;

27   Phase II – 16%; and Phase III – 53%.

28

104.   Credit Suisse also used those incorrect probability adjustments to value Cat-K and made additional serious errors in the analysis it undertook to provide a fairness opinion for the Merger, all of which caused Credit Suisse to significantly undervalue Celera's royalty assets and, in turn, the Company itself.

105.   Credit Suisse knew or recklessly disregarded that its interpretation of the Tufts Study was erroneous, as the Study plainly states "about two out of three drugs in Phase III trials will eventually reach the market."[14] Credit Suisse's calculations, including the 53% probability it applied to drugs, such as Cat-K, in Phase III trials, would have been clearly incorrect to Credit Suisse. Additionally, Credit Suisse's erroneous interpretation yielded probability adjustments much lower than the probability numbers Credit Suisse previously had been using in valuing Celera's royalty assets.

106.   Accurately applying the Tufts Study's methodology would have yielded a price substantially higher than the $8-per-share price Quest paid for Celera.

107.   Notably, Credit Suisse had *accurately* applied the Tufts Study's probabilities *until early 2011*, when Celera had reengaged with Quest regarding a potential deal, with Quest ultimately offering $8 per share.

108.   Given its significant financial incentive to obtain the Sale Bonus—which, as detailed above, led Credit Suisse to actively foreclose others' suggestions that Celera could engage in a strategic transaction not involving a sale of the entire Company—Credit Suisse was highly motivated to apply a flawed probability analysis, and knew or should have known its analysis was erroneous.

109.   Indeed, Credit Suisse expressed internally that deemphasizing the value of Celera's royalty assets would facilitate a transaction with Quest. In a February 2, 2011 e-mail, for instance, Credit Suisse's Mark Page stated to other Credit Suisse personnel that he was seriously considering valuing Celera using a "whole company" discounted cash flow ("DCF") analysis

---

[14] *Id.*

rather than analyzing the "sum of the parts," as the former would capture only "nominal cash flows" attributable to royalty assets.

**C.    The Celera Defendants Knew or Ignored that Credit Suisse's Valuation Analysis Suffered from Material Errors.**

110.    The Individual Defendants, and thus Celera, knew or disregarded that Credit Suisse had provided an erroneous valuation analysis.

111.    <u>First</u>, the clear disparity between Credit Suisse's prior probability adjustments, which it presented to the Celera Board as recently as February 3, 2011, and the substantially lower probability adjustments underlying the erroneous analysis *that were derived from the same Tufts Study*—which Credit Suisse presented to the Board just over one month later, during its meetings of March 7 and 17, 2011—either did alert, or should have alerted, the Individual Defendants to Credit Suisse's stark errors.

112.    Credit Suisse's errors should have been particularly obvious to the Individual Defendants, given that, since 2010, the Celera Board had received a steady stream of estimates valuing Cat-K significantly higher than the value incorporated in the final analysis Credit Suisse presented to the Board on March 17, 2011.

113.    <u>Second</u>, Ordoñez and the other Individual Defendants knew or recklessly disregarded that Credit Suisse's analysis suffered from material errors.  In fact, Ordoñez expressed skepticism regarding an earlier analysis by Credit Suisse (requested by Celera management in December 2010) of royalty rights related to drugs being developed by Pharmacyclics, which relied on the Tufts Study.  Immediately recognizing that, in light of independent analyses of Pharmacyclics, Credit Suisse's valuation of those assets was too low, Ordoñez commented, "I don't think CS [Credit Suisse] got the analysis right."

114.    Moreover, Credit Suisse's erroneous application of the probability adjustments included in the Tufts Study caused it to apply a 53% probability adjustment in valuing Cat-K, which was substantially lower than the figure Credit Suisse previously had applied.

115.    The Celera Board accepted, and passed on to Celera's shareholders, the inexplicably revised probability adjustments and the significant (but unexplained) drop in the

reported value of Cat-K. The Celera Board likewise ignored (i) its own knowledge about the significant value of the drugs Credit Suisse was purporting to value; (ii) Merck's substantial investment in Cat-K, including the extensive trial Merck was undertaking in advance of seeking FDA approval of the drug; and (iii) the success of the Pharmacyclics cancer drug ibrutinib.

**D.  The Celera Defendants Knew or Ignored that Other Aspects of Credit Suisse's Analysis Resulted in an Unduly Low Valuation of the Company.**

116.  In addition to its material errors in valuing Celera's royalty assets, Credit Suisse made critical, material errors with respect to other aspects of its analysis, which the Celera Board made no attempt to correct or obtain an explanation for.

117.  The "Selected Companies Analysis" Credit Suisse performed in providing its "fairness opinion," for example, included companies with business concentrations in clinical labs, products, or genetic testing, with the companies in the first two categories reflecting a lower revenue multiplier. Notwithstanding Celera's projections indicating that within five years genetic testing would comprise the Company's largest business segment, Credit Suisse categorized Celera as a clinical labs/products-based entity and then applied the lowest-possible multiple range the Selected Companies Analysis suggested for those categories.

118.  Similarly, when calculating the appropriate multiple for Celera based on a "Selected Transactions Analysis," Credit Suisse disregarded the 3.0x and 5.8x average multiples for target companies in those transactions, instead applying a 1.5x to 3.0x multiple to Celera's revenue projections. Had Celera used even the average multiples from the Selected Transactions Analysis, the bare minimum "implied per share equity reference" for the Company would have been substantially above the $8-per-share purchase price.

119.  Credit Suisse also counted stock-based compensation, a non-cash expense, as a cash expense in calculating Celera's unlevered free cash flow, resulting in a decrease in the discounted-cash-flow value ranges provided in the Recommendation Statement for the Merger. Moreover, Credit Suisse did not make that downward adjustment to Celera's DCF ranges until February 2011—after Quest had formalized its $8-per-share offer, and thus after Credit Suisse knew it had to issue a fairness opinion at that low price in order to receive the Sale Bonus.

-25-

**E.** **Subverting Shareholders' Interests for Those of Celera Management, the Board Caused Celera to Enter into a Merger Agreement with Quest.**

**1.** **Despite knowing, or recklessly disregarding, that Credit Suisse employed an erroneous analysis that undervalued Celera, the Celera Board accepted Quest's offer and used that analysis as justification for the $8-per-share price.**

120.    Despite its knowledge or reckless disregard that (i) a conflicted financial advisor, Credit Suisse, had mishandled the sale process; (ii) a conflicted CEO, Kathy Ordoñez, had led the negotiations; and (iii) Credit Suisse was able to justify Quest's final $8-per-share offer only by relying on an erroneous valuation analysis and fairness opinion, the Celera Board accepted Quest's offer of $8 per share.

121.    Celera and Quest executed the Merger Agreement on March 17, 2011 and announced the proposed Merger the next day.

122.    On March 18, 2011, the same day it announced the proposed Merger, Celera restated certain of its historical financial statements. The Company expressly recognized that, because of those restatements, it was subject to additional risks, including increased accounting and legal fees and the increased possibility of legal proceedings.

123.    Under the Merger Agreement, Quest agreed to indemnify Ordoñez and the rest of the Celera Board from any potential liability arising in connection with the restatements (or any other misconduct) for at least six years. At that time securities litigation based on Celera's accounting violations was already pending.

124.    With respect to consummating the Merger, as noted above, the Merger Agreement provided that Quest, acting through a wholly-owned subsidiary formed for the purpose of consummating the Merger (Spark Acquisition Corp.), would make a tender offer for all the outstanding shares of Celera's common stock. Upon the acquisition of at least 90% of Celera's outstanding common stock, Quest would acquire the remaining stock through a short-form merger. To ensure the short-form merger could proceed (without an informed vote of Celera's shareholders), Celera granted Quest a "Top Up Option," exercisable if Quest acquired a sufficient number of shares in the Tender Offer (assuming it would not exceed the number of shares authorized) so that Quest would then own 90% or more of the stock.

125.   Specifically, the Merger Agreement provided:

> The Company hereby grants to the Purchaser an irrevocable option (the "Top Up Option"), exercisable only after acceptance by the Purchaser of, and payment for, Shares tendered in the Offer and thereafter upon the terms and conditions set forth in this Section 2.4, to purchase, for consideration per Top Up Option Share equal to the Offer Price, up to that number of newly issued Shares (the "Top Up Option Shares") equal to the number of Shares that, when added to the number of Shares owned by Parent and the Purchaser immediately following the consummation of the Offer, shall constitute one share more than 90% of the Shares then outstanding on a fully diluted basis . . . .

126.   The Merger Agreement also contained a number of "deal protection" devices.  The "no shop" provision of Section 6.4(a) of the Merger Agreement, for example, provided that Celera would cease all discussions with potential acquirers, strategic partners, or parties that might be interested in acquiring Celera's assets, and that the Company would not solicit any new offers.  Furthermore, Section 6.4(c) provided "matching rights" to Quest, affording it the opportunity, within three business days after Celera's receipt of a proposal from a third party, to revise its proposal or persuade the Celera Board not to change its recommendation that shareholders approve the Merger.  And Section 6.4(e) provided Quest with unlimited information rights, requiring that Celera notify Quest within one day of receiving any proposal, and provided to Quest all materials received in connection with the proposal.  The Merger Agreement also imposed a $23.45 million termination fee, representing 10% of the $236 million implied price Quest was paying for Celera's non-financial assets.

127.   Additionally, as previously noted, before agreeing to proceed with Quest, Celera had insisted that other potential bidders consent to standstill agreements prohibiting them from even requesting (without having been expressly invited by Celera) Celera's permission to make a competing bid.

128.   While the settlement in the Delaware Class Proceedings ultimately called for slight modifications of some provisions of the Merger Agreement, including removing certain standstill provisions and lowering the amount of the termination fee, those minor alterations were insignificant.  In particular, the standstill provisions already had inhibited potential bidders from making unsolicited offers for Celera; lifting those provisions merely at the tail end of the Merger

-27-

process—when the Quest deal was on the cusp of being consummated—was essentially meaningless.

### 2. While negotiating the proposed Merger, Ordoñez and others at Celera obtained lucrative severance packages or post-Merger employment agreements.

129. Members of Celera's management reaped significant personal benefits from the Merger. Quest entered into an employment agreement with Ordoñez to serve as Senior Vice President of Quest, which entitled her to an annual base salary and annual bonus opportunity enabling her to earn more than $1 million a year, as well as other benefits. Ordoñez also would receive a one-time cash payment of about $2.3 million, 20,000 shares of performance-based restricted shares of Quest common stock, and a one-time grant of time-vesting restricted shares of Quest common stock equal to nearly another $500,000. Other executives also received lucrative employment agreements. Ordoñez thus stood to gain millions of dollars from the sale of Celera to Quest. Moreover, Ordoñez's new employment package was worth far more than the initial employment package Quest had offered to her in June 2010.

130. In the nine months between Quest's withdrawal of its offer of $10.25 per share and the Celera Board's ultimate approval of the Merger, Quest's offer for Celera was reduced by $2.25 per share (or nearly $200 million in total), Ordoñez and other members of Celera's management secured millions of dollars of additional payments that Quest previously was unwilling to make, and Credit Suisse earned a multi-million dollar Sale Bonus that it would not have received had Celera successfully pursued other strategic alternatives.

### 3. The Individual Defendants and Credit Suisse failed to seek out other offers to potentially top or enhance Quest's offer.

131. After Quest made its $8-per-share offer in January 2011, neither the Celera Board nor Credit Suisse reached out to any other potential bidders. The Board failed to conduct a market check despite knowing that, among other positive developments for Celera, Cat-K continued to progress through its Phase III trial and ibrutinib had entered Phase II development.

132. In that regard, in March 2011, Merck announced that its massive Phase III Cat-K study had 17,000 patients enrolled and was ongoing and that Merck planned to file for FDA

-28-

1   approval in 2012. Despite those promising developments, the Celera Board did not instruct

2   Credit Suisse to go back to bidders that had expressed an interest in 2010 to determine whether

3   there was any renewed interest among them, or to reach out to any potential new bidders.

4       133.   Even when potential bidders contacted Celera on their own initiative, they were

5   rebuffed or ignored. On January 19, 2011, for example, Credit Suisse received an indication from

6   one potential bidder expressing a desire to talk about the Celera sale process, but the bidder was

7   brushed off without explanation. In February 2011, another bidder proposed a purchase price of

8   $125 to $145 million in cash for Celera's Products business alone. The Celera Board similarly

9   dismissed that offer without negotiation. Additionally, an offer from Pharmacyclics to reacquire

10  a portion of Celera's royalty rights was, by Ordoñez's admission, disregarded.

11              **4.    After multiple extensions of its Tender Offer, Quest barely acquired
                        enough shares to effect a short-form merger.**

12

13  134.   Quest's Tender Offer, originally scheduled to close on April 25, 2011, was

14  extended until May 2, 2011 in accordance with the proposed settlement in the Delaware Class

    Proceedings. Even as of the extended deadline, however, Quest had failed to obtain a majority of

15  Celera's outstanding shares; Quest thus extended the Tender Offer for another day.

16

17  135.   Quest ultimately had to extend the Tender Offer several more times—and even

18  resorted to purchasing shares in the market at a price higher than the offer price—to acquire

    enough shares to exercise the Top Up Option.

19

20  136.   The Merger was consummated on May 17, 2011. On or around that date, Celera

21  shares that had not yet been tendered were automatically tendered pursuant to the short-form

    merger.

22

23          **F.    Celera Issued a Materially False or Misleading Recommendation Statement
                    Reflecting Credit Suisse's Erroneous Valuation and Included a Materially
                    False or Misleading "Investor Presentation" as an Exhibit to the
                    Recommendation Statement.**

24

25  137.   In recommending the proposed Merger to Celera shareholders, Celera issued the

26  Recommendation Statement on March 28, 2011, which Ordoñez signed. The Recommendation

27  Statement, among other things, made representations about the analysis Credit Suisse performed

28

in arriving at its "implied per share equity reference range," i.e., valuation, of the Company as part of Credit Suisse's "fairness opinion" for the proposed Merger.

138.    The Recommendation Statement contained material misstatements or omissions regarding Credit Suisse's valuation analysis.

139.    The Recommendation Statement, as initially filed on March 28, 2011, stated, with respect to Credit Suisse's use of the Tufts Study in valuing Celera's royalty assets:

> Credit Suisse calculated the present value of the Company's interest in its non-commercial, development stage drug assets based on forecasts of launch dates, peak sales and milestone and royalty payments for the Company's non-commercial, development stage drug assets by the Company's management and publicly available research analyst reports. In performing this analysis, Credit Suisse combined traditional discounted cash flow methodology with estimated clinical-trial success rates to yield probability-adjusted after-tax free cash flows related to each drug asset. The probability rates for clinical trial success were derived from a study published in 2002 by the Milken Institute based on data from the Tufts University Center for the Study of Drug Development, and were not based on any judgment with respect to the particular drug assets. These cash flows were discounted at a range of 13.0% to 15.0% based on the Company's estimated weighted average cost of capital. Credit Suisse chose this range of discount rates as appropriately illustrative based upon its assessment of certain financial metrics for the Company and other companies it deemed comparable.

140.    The Recommendation Statement also included Credit Suisse's fairness opinion, which stated, among other things:

> In arriving at our opinion, we have reviewed a draft dated March 17, 2011 of the Merger Agreement and certain publicly available business and financial information relating to the Company. We have also reviewed certain other information relating to the Company, including financial forecasts, provided to or discussed with us by the Company and have met with the Company's management to discuss the business and prospects of the Company. We have also considered certain financial and stock market data of the Company, and we have compared that data with similar data for other publicly held companies in businesses we deemed similar to that of the Company and we have considered, to the extent publicly available, the financial terms of certain other business combinations and other transactions which have been effected or announced. We also considered such other information, financial studies, analyses and investigations and financial, economic and market criteria which we deemed relevant.

*****

Our opinion is necessarily based upon information made available to us as of the date hereof and financial, economic, market and other conditions as they exist and can be evaluated on the date hereof. Our opinion also is based on certain assumptions discussed with you as to future results with respect to certain drug assets and which, if different than assumed, could have a material impact on our analyses.

141. Additionally, an April 15, 2011 amendment to the Recommendation Statement stated:

Using clinical trial success rates from a 2002 report published by the Milken Institute, Credit Suisse adjusted . . . cash flows [attributable to Celera's interest in Cat-K and Pharmacyclics drug assets through 2025] to reflect the risks associated with the stage of clinical development of each drug asset. The probability rates applied by Credit Suisse were not based on any judgment with respect to the particular drug assets, but on summary data published by the Tufts University Center for the Study of Drug Development and included in the report. Different forecasts with respect to launch dates, peak sales, milestone and royalty payments and clinical trial success rates would have a material impact on Credit Suisse's analysis of the Company's development stage drug assets.

142. Neither Celera's nor Credit Suisse's statements in the Recommendation Statement disclosed that (as detailed in ¶¶ 92-109 above) Credit Suisse misapplied the Tufts Study in valuing Celera's royalty assets, resulting in a significant undervaluation of those assets, which in turn resulted in artificially low "implied per share equity reference range" stated in the Recommendation Statement. Specifically, the implied range was materially lower than it would have been had Credit Suisse correctly applied the probabilities provided in Tufts Study; in fact, had Credit Suisse performed the arithmetic accurately, the absolute minimum purportedly "fair" price would have been above the $8-per-share sale price.

143. Moreover, as detailed in ¶¶ 92-115 above, the Celera Defendants and Credit Suisse knew or should have known those statements in the Recommendation Statement were false or misleading when made.

144. Further seeking to justify Quest's inadequate offer, Celera disseminated an "investor presentation," filed as an amendment to the Recommendation Statement on April 19, 2011, by which the Company took the extraordinary step of highlighting negative aspects of its own historical financial results and pointing to the "significant risks" its business faced. The

COMPLAINT
CASE NO. _____

1 | presentation described the proposed Merger as "[a] compelling transaction to deliver shareholder

2 | value now."

3 |     145.   In addition to generally undermining shareholders' best interests and helping

4 | ensure that neither Quest nor anyone else would improve upon the inadequate $8-per-share offer

5 | on the table, the investor presentation contained several misstatements or omissions.

6 |     146.   The presentation stated, for example, that during a "[y]ear-long comprehensive

7 | process" to assess "strategic partnership opportunities," the Celera Board "reviewed various

8 | strategic alternatives," including, in addition to an "entire company transaction," a "sale of all or

9 | part of the business" and "other value alternatives for company businesses/assets." Celera further

10 | represented in the presentation that it had "sought to exclude the drug assets from the sale to

11 | Quest or to get a contingent value right for Celera stockholders."

12 |     147.   The statements in the preceding paragraph concerning Celera's purported efforts in

13 | evaluating "strategic alternatives" were materially false or misleading because, as detailed above,

14 | Celera and Credit Suisse failed to adequately consider the prospect of a strategic transaction that

15 | would involve separating out the Company's royalty assets. Indeed, the Celera Board and Credit

16 | Suisse disregarded, or actively dismissed, potential offers of that nature.

17 |     148.   The investor presentation also stated the Board "reviewed the valuation of, and

18 | potential strategic alternatives for, Celera's drug assets" by relying on a "[f]inancial analysis

19 | prepared with assistance of Credit Suisse, taking into account both the prospects and risks for the

20 | individual drug assets, and analyzing present value considerations for potential future revenue

21 | streams."

22 |     149.   The statements in the preceding paragraph were materially false or misleading

23 | because, as detailed above, Credit Suisse applied an erroneous analysis in assessing the value of

24 | Celera's royalty assets, which the Celera Defendants knew or should have known.

25 | **APPLICABILITY OF THE GROUP-PLEADING DOCTRINE**

26 |     150.   The Individual Defendants are liable for the materially false and misleading

27 | statements and omissions alleged in this Complaint—in support of Plaintiffs' claims under

28 | Section 14(e) of the Exchange Act—that were issued by, or in the name of, Celera, as each of

-32-

1   those statements constituted "group-published" information and resulted from the collective

2   actions of the Individual Defendants. It is appropriate to treat the Individual Defendants as a

3   group and to presume that the public filings and other public statements complained of herein are

4   the product of the collective actions of this narrowly defined group of Defendants.

5          151.    The Individual Defendants, by virtue of their high-level positions within Celera

6   and their responsibilities in connection with the Merger, directly and actively participated in the

7   management and day-to-day operations of the Company, and were privy to confidential, non-

8   public information concerning the Company's business and operations.

9          152.    Additionally, the Individual Defendants were involved in drafting, reviewing, or

10  disseminating the materially false and misleading statements Celera issued during the relevant

11  period, and approved or ratified those statements, thus adopting them as their own.

12  **INAPPLICABILITY OF THE PRIVATE SECURITIES LITIGATION REFORM ACT'S "SAFE HARBOR" PROVISION**

13

14         153.    The "safe harbor" that the Private Securities Litigation Reform Act ("PSLRA")

15  affords to certain "forward-looking" statements does not apply to any of the false or misleading

    statements alleged in this Complaint because none of those statements are "forward-looking"
16
    and/or no such statement was appropriately identified as a "forward-looking statement" when
17
    made. Rather, the statements alleged in this Complaint as materially false or misleading under
18
    Section 14(e) of the Exchange Act all relate to facts and conditions existing at the time the
19
    statements were made. Moreover, meaningful cautionary statements did not specifically identify
20
    important factors that could cause actual results to differ materially from those in any putatively
21
    forward-looking statements.
22
           154.    Alternatively, to the extent the statutory safe harbor does apply to any statement
23
    alleged in this Complaint (in support of Plaintiffs' claims under Section 14(e) of the Exchange
24
    Act) that is deemed to be forward-looking, Defendants are nonetheless liable for the false
25
    forward-looking statements because at the time each such statement was made, each Defendant
26
    actually knew that any such forward-looking statement was false or misleading, or that each such
27
    statement was authorized or approved by a director or executive officer of Celera who actually
28

1  knew that each such statement was false or misleading when made. None of the historic or

2  present-tense statements made by Defendants constituted an assumption underlying or relating to

3  any plan, projection, or statement of future economic performance, as they were not stated to be

4  such an assumption underlying or relating to any plan, projection, or statement of future

5  economic performance when made, nor were any of the projections or forecasts made by

6  Defendants expressly related to, or stated to be dependent on, those historic or present-tense

7  statements when made.

8  **TIMELINESS OF PLAINTIFFS' CLAIMS**

9       155.    Plaintiffs have brought their claims within the applicable statutes of limitations and

10  repose. With respect to the statutes of limitations, Plaintiffs neither discovered, nor in the

11  exercise of reasonable diligence could have discovered, before the expiration of any applicable

12  limitations period, facts indicating Defendants' misconduct.

13       156.    Plaintiffs' claims are also subject to equitable tolling due to the surreptitious nature

14  of Defendants' misconduct, which Defendants concealed from Plaintiffs and other investors

15  throughout the relevant period.

16       157.    Furthermore, Defendants' misconduct constituted a "continuous violation" as

17  defined under the law, such that the limitations periods for Plaintiffs' claims did not accrue until

18  the date of the last wrong or injury that is the subject of this action.

19       158.    Plaintiffs' claims are also subject to tolling under the doctrine endorsed in

20  *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny, by virtue of

21  Plaintiffs' prior status as absent class members in the Delaware Class Proceedings as well as in

22  putative class actions brought in this District and in other courts. Accordingly, the statutes of

23  limitations and repose applicable to Plaintiffs' claims have been tolled as of the date the first

24  putative class action encompassing Plaintiffs' claims, or claims arising from the same nucleus of

25  operative facts as those giving rise to Plaintiffs' claims, was filed.

26       159.    In addition to the foregoing, Defendants are equitably estopped, by virtue of their

27  misconduct, from asserting that Plaintiffs' claims are time-barred.

28

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF SECTION 14(e) OF THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78n(e)

### (Against the Celera Defendants and Credit Suisse)

160.    Plaintiffs repeat and reallege the above allegations as if fully set forth in this paragraph.

161.    Section 14(e) of the Exchange Act (15 U.S.C. § 78n(e)) renders it unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

162.    As detailed in ¶¶ 137-49 above, the Recommendation Statement contained misstatements or omissions of material fact concerning (i) Credit Suisse's valuation of Celera's royalty assets, (ii) Celera's purported efforts to seek a strategic transaction other than a sale of the whole Company, and (iii) Celera's purported efforts "to exclude the drug assets from the sale to Quest or to get a contingent value right for Celera stockholders".

163.    Those misstatements or omissions were material, in that a reasonable investor would have deemed those facts important in determining whether to tender its shares of Celera stock in connection with the Merger.  Indeed, the Recommendation Statement (as amended) stated, "Different forecasts with respect to launch dates, peak sales, milestone and royalty payments and clinical trial success rates would have a material impact on Credit Suisse's analysis of the Company's development stage drug assets."

164.    As detailed in ¶¶ 92-115 above, the Celera Defendants and Quest knew or should have known that the Recommendation Statement contained the above misstatements or omissions.

-35-

COMPLAINT
CASE NO. _____

165. As a direct and proximate result of those material misstatements or omissions, Plaintiffs suffered significant damages.

166. Accordingly, the Celera Defendants and Quest are liable for violating Section 14(e) of the Exchange Act.

167. Plaintiffs are therefore entitled to recover an amount to be determined at trial.

## COUNT II

## VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. § 78t(a)

### (Against the Celera Defendants)

168. Plaintiffs repeat and reallege the above allegations as if fully set forth in this paragraph.

169. During their tenures as officers and/or directors of Celera, the Individual Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Celera, these Defendants had the power and authority to cause the Company to engage in the wrongful conduct alleged in this Complaint. The Individual Defendants were able to, and did, control, directly and indirectly, the content of the public statements made by Celera concerning the Merger, thereby causing the dissemination of the materially false and misleading statements and omissions of material fact alleged in this Complaint. Additionally, Celera controlled the Individual Defendants and its employees.

170. As set forth above, Celera violated Section 14(e) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Celera and as a result of their own conduct, the Individual Defendants are liable to Plaintiffs under Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Celera is liable under Section 14(e) of the Exchange Act.

171. Additionally, as set forth above, the Individual Defendants violated Section 14(e) of the Exchange Act by their acts and omissions alleged in this Complaint. As a controlling person of the Individual Defendants, Celera is liable to Plaintiffs under Section 20(a) of the

COMPLAINT
CASE NO. _____

1    Exchange Act, jointly and severally with, and to the same extent as, the Individual Defendants are

2    liable under Section 14(e) of the Exchange Act.

3       172.    Plaintiffs are therefore entitled to recover an amount to be determined at trial.

### COUNT III

### BREACH OF FIDUCIARY DUTY

### (Against the Individual Defendants)

7       173.    Plaintiffs repeat and reallege the above allegations as if fully set forth in this

8    paragraph.

9       174.    The Individual Defendants owed Plaintiffs the utmost fiduciary duties of due care,

10   loyalty, good faith, and complete candor.  Moreover, having decided to sell Celera for cash, the

11   Celera Board assumed the fiduciary duty to undertake reasonable efforts to secure the highest

12   price realistically achievable given the market for the Company.  In so doing, the Board was

13   required to work diligently to secure the transaction or transactions offering the best value

14   reasonably available for all Celera shareholders.

15      175.    The Individual Defendants' fiduciary duties required them to affirmatively protect

16   and defend those interests entrusted to them and to exert all reasonable and lawful efforts to

17   ensure that the Company and its shareholders were not deprived of any advantage to which they

18   were entitled.

19      176.    The Individual Defendants could not avoid their active and direct duty of oversight

20   in a matter as significant as the sale of corporate control.

21      177.    The Individual Defendants failed to satisfy their fiduciary duties in numerous

22   ways.

23   A.    **The Individual Defendants Abdicated to Credit Suisse Their Fiduciary
         Responsibilities Despite Knowing or Recklessly Disregarding that Credit
24       Suisse Was Conflicted and Performed an Erroneous Valuation Analysis.**

25      178.    Despite knowing that Credit Suisse was materially self-interested in pursuing a

26   sale of all or most of Celera in order to obtain its multi-million dollar Sale Bonus, the Individual

27   Defendants relinquished control over the sale process, including price negotiations, to Credit

28   Suisse and acquiesced to its insistence that the entire Company be sold.  The Individual

1  Defendants allowed Credit Suisse to run the sale process even when it became obvious to the

2  Individual Defendants that the process was being mishandled.

3      179.    Credit Suisse made no attempt to gauge the interest of any potential private equity

4  buyers or to contact potential bidders in the business of valuing and acquiring passive royalty

5  assets; for example, they never reached out Merck, Pharmacyclics, or BVF. Indeed, BVF had

6  held multiple in-person meetings with Ordoñez and Celera's Chairman William Green for the

7  express purpose of making clear Plaintiffs' interest in the royalty assets. Additionally, certain

8  Individual Defendants complained that the input of George Boutros, Credit Suisse's initial team

9  leader in connection with the sale process, was ineffectual, and were worried that Boutros could

10 undermine the process because he was consistently out of the loop, distracted by other deals, and

11 difficult to contact. Despite those concerns, the Individual Defendants abdicated to Boutros and

12 the rest of the Credit Suisse team virtually all responsibility for the sale process, thereby acting in

13 bad faith and in breach of their fiduciary duties.

14      **B.    The Individual Defendants Also Abdicated to Ordoñez Their Fiduciary
15          Responsibilities Despite Knowing She Was Tainted by a Disabling Conflict of
            Interest.**

16      180.    In addition to eschewing their fiduciary duties to Plaintiffs and other Celera

17 shareholders by allowing Credit Suisse—which suffered from a conflict of interest—to take

18 significant control of the sale process, the Individual Defendants further allowed Ordoñez to

19 control the Quest negotiations despite knowing she was also conflicted.

20      181.    In the summer of 2010, for example, despite knowing that the terms of Ordoñez's

21 employment would be a significant factor in whether a deal with Quest would go forward at

22 $10.25 per share, the Individual Defendants permitted Ordoñez (along with the similarly

23 conflicted Credit Suisse) to play a central role in negotiations with Quest. After Ordoñez

24 demanded unreasonable employment concessions and millions of dollars as a change-of-control

25 payment, Quest withdrew its offer.

26      182.    In light of Ordoñez's failure to close the original Quest deal and other

27 shortcomings, Ordoñez's position as CEO was put in jeopardy, as even the Celera Board began to

28 criticize her performance and doubt whether she could lead the Company. Shareholders began

1 demanding changes that would maximize the value of Celera's resources, including its valuable

2 royalty assets, and were preparing to challenge Ordoñez's reelection as a director, which she

3 knew.

4     183. By the end of 2010 and early 2011, Ordoñez had a disabling self-interest in

5 ensuring that a sale of the whole Company would occur, regardless of the price, with the buyer

6 offering her continued employment.

7     184. The Individual Defendants were well aware of Ordoñez's self-interest and

8 understood that (i) her unreasonable employment demands had materially contributed to Quest's

9 decision to withdraw its proposal in the summer of 2010; (ii) she had a tendency to withhold

10 information from the Board; (iii) she had a motive to sell the Company, regardless of the price,

11 before she was removed as director, CEO, or both; and (iv) she would be negotiating a lucrative

12 employment contract contingent on the closing of a transaction with Quest.

13     185. The Celera Board was not adequately involved in the sale process. Testimony

14 offered in the Delaware Class Proceedings, for example, confirmed that the Special Committee

15 was not designed to negotiate and that all such matters were left to Ordoñez and Credit Suisse.

16     186. In light of the foregoing, the Individual Defendants acted in bad faith and breached

17 their fiduciary duties.

18     **C.**   **The Individual Defendants Used Credit Suisse's Fairness Analysis to Justify**
          **Accepting Quest's Offer Despite Knowing or Recklessly Disregarding that**
19           **Credit Suisse Had Significantly Undervalued Celera's Royalty Assets.**

20     187. The Individual Defendants further breached their fiduciary duties by knowing or

21 recklessly disregarding material errors contained in Credit Suisse's fairness analysis.

22     188. Despite knowing or recklessly disregarding that the analysis contained significant

23 errors that materially depressed the estimated value of Celera, the Individual Defendants accepted

24 Credit Suisse's analysis and used it to justify the acceptance of Quest's $8-per-share offer.

25     189. The Individual Defendants further breached their fiduciary duties by failing to

26 disclose to Celera shareholders that Credit Suisse had applied an erroneous valuation analysis and

27 by allowing other material misstatements or omissions to be included in the Recommendation

28 Statement, as detailed in ¶¶ 92-115 above.

-39- COMPLAINT
        CASE NO. _____

**D.**   **The Individual Defendants Further Breached Their Fiduciary Duties by**
**Failing to Conduct a Market Check or to Adequately Attempt to Engage the**
**Company in an Alternative Strategic Transaction.**

190.   The Individual Defendants further breached their fiduciary duties of loyalty and due care by failing to adequately consider whether an alternative transaction, such as a spin-off of Celera's royalty assets, would yield greater value for shareholders than would a sale of the entire Company, and by failing to institute a process that would adequately develop offers for such alternative transactions.

191.   The Individual Defendants further breached their fiduciary duties by consciously failing to conduct a market check after Quest's January 2011 offer and by refusing even to consider other offers for alternative transactions.

192.   The Individual Defendants instead approved various deal-protection devices to further discourage other potential bidders from coming forward. The "no shop" provision, for example, prevented Celera from seeking or encouraging more lucrative alternative transactions, and even prevented Celera from providing nonpublic information to unsolicited bidders expressing an interest. Additionally, by affording Quest the opportunity to match any bid, the matching-rights provision dissuaded potential bidders from making a bid, thereby preventing a would-be bidder from offering a substantially larger bid conditioned on an end to bidding. The relatively large size of the termination fee, which represented 10% of the value paid for Celera's core business operations, further served to discourage potential bidders. And the standstill agreements prevented previously interested bidders from bidding.

193.   Although Celera made slight modifications to those deal protections, pursuant to the settlement agreement in the Delaware Class Proceedings, those changes were essentially meaningless. The alterations were made only a few weeks before the Merger was set to close, providing insufficient time for other potential bidders—even those who previously had bid—to conduct due diligence and make a proposal. The changes were not sufficient to materially increase the likelihood that Celera would receive a proposal superior to Quest's $8-per-share offer.

194. Even assuming *arguendo* the minor tweaks to the terms of the proposed transaction resulting from the settlement might have had some theoretical benefit to Celera's shareholders by making it more likely Celera would receive a superior proposal, any such theoretical benefit was undermined by Celera's "investor presentation" disparaging the Company and its assets. Among other things, the presentation enumerated the risks the Company faced and, most significantly, (incorrectly) denigrated the value of the Company's royalty assets.

195. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Plaintiffs suffered significant damages.

196. Plaintiffs are therefore entitled to a recovery in an amount to be determined at trial.

**E.    The Exculpatory Clause in Celera's Certificate of Incorporation Does Not Immunize the Individual Defendants from Liability.**

197. Celera's certificate of incorporation contained a provision, pursuant to 8 Del. C. § 102(b)(7) ("Section 102(b)(7)"), eliminating the monetary liability of directors for their breaches of the duty of care.

198. Section 102(b)(7) affords corporations a limited and narrow ability to exculpate directors from monetary liability, but only for their breaches of the duty of care. Section 102(b)(7) mandates, however, that such a provision cannot "eliminate or limit the liability of a director" for, *inter alia*, "any breach of the director's duty of loyalty to the corporation or its stockholders," "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law," or "any transaction from which the director derived an improper personal benefit."

199. Accordingly, to the extent Celera's exculpatory provision applies to the Individual Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability, (ii) monetary liability for their breaches of the duty of loyalty, (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law, or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Individual Defendants' misconduct in connection with the Merger (i) involved breaches of

1    their duty of loyalty, (ii) involved acts or omissions not in good faith or that involved intentional

2    misconduct or a knowing violation of law, and (iii) occurred in connection with a transaction

3    from which the Individual Defendants derived improper personal benefits.  Celera's exculpatory

4    provision therefore cannot immunize the Individual Defendants from liability for that misconduct.

5          200.    Additionally, the exculpatory provision cannot apply to the extent Ordoñez

6    committed misconduct in her capacity as an officer of the Company.

7          201.    Nor can the exculpatory provision apply to the extent the Individual Defendants'

8    breach of the duty of care is the subject of aiding-and-abetting claims against other Defendants.

9

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**

**(Against Credit Suisse)**

12          202.    Plaintiffs repeat and reallege the above allegations as if fully set forth in this

13    paragraph.

14          203.    Credit Suisse owed fiduciary duties of due care, loyalty, and good faith to Celera's

15    shareholders, including Plaintiffs.

16          204.    Credit Suisse knew or recklessly disregarded that the analysis underlying its

17    "fairness opinion" for the Merger was plagued by material misstatements, omissions, or errors

18    that wrongfully depressed Credit Suisse's valuation of Celera.  At a bare minimum, Credit Suisse

19    was grossly negligent.

20          205.    In blatant disregard of the fiduciary duties it owed to Celera's shareholders, Credit

21    Suisse provided the erroneous analysis to the Celera Board, despite knowing that some or all of

22    the analysis would be shared with, and relied on by, Celera's shareholders.

23          206.    Indeed, Credit Suisse assisted Celera in preparing the disclosures to Celera's

24    shareholders that contained Credit Suisse's erroneous analysis.

25          207.    As a direct and proximate result of Credit Suisse's breach of its fiduciary duties,

26    Plaintiffs suffered significant damages.

27          208.    Plaintiffs are therefore entitled to a recovery in an amount to be determined at trial.

28

COUNT V

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**(Against Credit Suisse and Quest)**

209.    Plaintiffs repeat and reallege the above allegations as if fully set forth in this paragraph.

210.    The Individual Defendants owed fiduciary duties of loyalty, due care, and good faith to Celera's shareholders, including Plaintiffs.

211.    The Individual Defendants breached their fiduciary duties as described above.

212.    Credit Suisse knowingly participated in the Individual Defendants' breach of their fiduciary duties.  As described above, to obtain the significant Sale Bonus, Credit Suisse participated in, and encouraged the breach of, the Individual Defendants' fiduciary duties by, among other things:  (i) pushing the Individual Defendants into selling the entire Company without adequately considering whether an alternative transaction would provide greater value to Celera's shareholders; (ii) taking control of, and mishandling, the sale process; (iii) providing an erroneous analysis to the Individual Defendants that Credit Suisse knew, or recklessly disregarded, contained significant errors, while knowing that some or all of the analysis would be shared with, and relied on by, Celera's shareholders; (iv) pushing the Individual Defendants into accepting Quest's inadequate $8-per-share offer; and (v) assisting the Individual Defendants with the preparation and dissemination of public disclosures to Celera's shareholders that Credit Suisse knew, or recklessly disregarded, contained material misstatements and omissions.

213.    Quest also knowingly participated in the Individual Defendants' breach of their fiduciary duties.  As described above, to obtain control of Celera and its assets for less than their true value, Quest participated in, and encouraged the breach of, the Individual Defendants' and Credit Suisse's fiduciary duties by, among other things, (i) negotiating almost exclusively with Ordoñez despite knowing that she was self-interested in the transaction being negotiated; (ii) working with Ordoñez to convince the Celera Board to accept Quest's $8-per-share offer without conducting a market check or considering alternatives, such as spinning off the Company's royalty assets or issuing contingent-value rights; (iii) constructing deal-protection

devices that prevented the Individual Defendants from adequately informing themselves of potential alternatives that could provide greater value to shareholders; and (iv) affording the Individual Defendants six years of indemnification for misconduct while at the Company, despite the pendency of securities litigation accusing certain Defendants of accounting fraud.

214.    As a direct and proximate result of Credit Suisse's and Quest's misconduct, Plaintiffs suffered significant damages.

215.    Plaintiffs are therefore entitled to a recovery in an amount to be determined at trial.

## PRAYER FOR RELIEF

216.    WHEREFORE, Plaintiffs demand judgment as follows:

a.    Finding the Celera Defendants and Credit Suisse liable for violating Section 14(e) of the Exchange Act;

b.    Finding the Celera Defendants liable for violating Section 20(a) of the Exchange Act;

c.    Finding the Individual Defendants liable for breaching their fiduciary duties;

d.    Finding Credit Suisse liable for breaching its fiduciary duties and for aiding and abetting the Individual Defendants' breaches of fiduciary duty;

e.    Finding Quest liable for aiding and abetting the Individual Defendants' and Credit Suisse's breaches of fiduciary duty;

f.    Awarding Plaintiffs compensatory damages, together with pre- and post-judgment interest at the maximum rate allowable by law;

g.    Awarding Plaintiffs punitive damages to the extent allowable by law;

h.    To the extent, if at all, the Court determines that Plaintiffs cannot obtain relief under the legal theories articulated in this Complaint, conducting a quasi-appraisal with respect to Plaintiffs' shares tendered pursuant to the Merger, together with pre- and post-judgment interest at the maximum rate allowable by law;

i.    Awarding Plaintiffs the costs and disbursements of this action, including attorneys' and experts' fees; and

COMPLAINT
CASE NO. _____

1     j.   Awarding such other and further relief as is just and proper.

2          **<u>DEMAND FOR JURY TRIAL</u>**

3    Plaintiffs hereby demand a trial by jury on all issues so triable.

4

5  Dated:  July 12, 2013

6

7        Richard M. Heimann (Cal. Bar No. 063607)
         Joy A. Kruse (Cal. Bar No. 142799)

8        Bruce W. Leppla (Cal. Bar No. 071649)
         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

9        275 Battery Street, 29th Floor
         San Francisco, CA 94111-3339

10       Telephone: (415) 956-1000
         Facsimile: (415) 956-1008

11       Email:  rheimann@lchb.com
            jakruse@lchb.com

12           bleppla@lchb.com

13        Michael J. Miarmi
         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

14       250 Hudson Street, 8th Floor
         New York, NY 10013-1413

15       Telephone: (212) 355-9500
         Facsimile: (212) 355-9592

16       Email:  mmiarmi@lchb.com

17

18        *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

1121862.1          -45-        **COMPLAINT**
                          CASE NO. _____