1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   BIOTECHNOLOGY VALUE FUND, L.P.,
     BIOTECHNOLOGY VALUE FUND II,
11   L.P., INVESTMENT 10, L.L.C., BVF                No. C 13-03248 WHA
     INVESTMENTS, L.L.C.; BVF INC., and
12   BVF X, LLC,

13          Plaintiffs,                              **ORDER GRANTING
                                                     MOTIONS TO DISMISS**
14       v.

15   CELERA CORPORATION, QUEST
     DIAGNOSTICS INCORPORATED,
16   CREDIT SUISSE SECURITIES (USA)
     LLC, KATHY ORDOÑEZ, RICHARD H.
17   AYERS, JEAN-LUC BELINGARD,
     WILLIAM G. GREEN, PETER BARTON
18   HUTT, GAIL M. NAUGHTON, WAYNE
     I. ROE, and BENNETT M. SHAPIRO,
19
            Defendants.
20   _____/

21

22                            **INTRODUCTION**

23          In this action asserting claims under federal securities law and state law, defendants filed

24   two motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  To the extent stated

25   below, both motions are **GRANTED**.

26                             **STATEMENT**

27          The essence of this case is that a public company was acquired by a purchaser and certain

28   former shareholders are now complaining that the acquisition price was approved too low as a

result of alleged misrepresentations in the recommendation statement and fairness opinion.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1      **1.    THE ACQUISITION.**

2          Defendant Celera Corporation is a healthcare company.  It holds royalty rights for drugs

3      being developed by other companies, such as odanacatib ("Cat-K"), an osteoporosis drug, and

4      ibrutinib, a cancer drug.

5          In March 2010, Celera signed an engagement letter with defendant Credit Suisse

6      Securities (USA), to advise Celera on potential strategic transactions.  For its services, Credit

7      Suisse would receive an initial payment of $250,000; additionally, if 50% or more of Celera was

8      sold, Credit Suisse would receive one million dollars to prepare a fairness opinion as well as a

9      sales bonus equal to 1.3% of the sale's total transaction value.  Throughout the following

10     months, Credit Suisse and Celera's CEO and director — Kathy Ordoñez — contacted potential

11     bidders for Celera.

12         On May 21, 2010, defendant Quest Diagnostics Incorporated submitted a formal bid to

13     acquire Celera at $10.00 per share.  On June 25, Quest increased its offer to $10.25 per share,

14     contingent on employment agreements with key Celera employees.  On June 29, Quest

15     recognized internally that Ordoñez was unwilling to accept the terms of Quest's offer of

16     employment.  She sought a $3.4 million change-in-control payment to her in connection with the

17     acquisition.  On June 30, Quest withdrew its acquisition offer, citing concerns about the retention

18     of Celera's management and Celera's "KIF6" gene variance products.

19         After "facing possible termination as CEO, shareholder unrest, the potential loss of her

20     seat on the Celera [b]oard, and pending securities litigation" in other matters, Ordoñez contacted

21     Quest to restart negotiations.  On February 17, 2011, Quest made a final offer of $8 per share

22     ($680 million in total) for Celera.  The amended complaint alleges that the offer's true value was

23     closer to $236 million, after factoring out Celera's $327 million in cash and $117 million in tax

24     credits (Amd. Compl. ¶¶ 2, 80–81).

25         In March 2011, Credit Suisse presented a fairness opinion to Celera's board of directors,

26     concluding that Quest's offer of $8 per share was a fair acquisition price.  In reaching this

27     determination, the fairness opinion analyzed the value of Celera's drug royalties stream based on

28     a 2002 study that, in turn, relied on data from the Tufts University Center for the Study of Drug

United States District Court
For the Northern District of California

Development.  Under the Tufts study's methodology, projected cash flows for a drug in development could be combined with a set of general probabilities as to whether that drug would reach the market, based on the stage of development:  "(i) for Phase I trials — 20%; (ii) for Phase II trials — 30%; [and] (iii) for Phase III trials — 67% . . ." (*id.* ¶ 97).

According to the amended complaint, Credit Suisse used the wrong probabilities in evaluating Cat-K and other drug royalty assets:  "Phase I — 3%; Phase II — 16%; and Phase III — 53%."  This caused Credit Suisse "to significantly undervalue Celera's royalty assets," and that had Credit Suisse accurately applied the Tufts study's methodology, the analysis "would have yielded a price substantially higher than the $8-per-share price Quest paid for Celera."  The amended complaint further asserts that earlier, "Credit Suisse had *accurately* applied the Tufts [s]tudy's probabilities."  Thus, the switch looks now suspiciously like a gimmick to justify a low ball offer for the company.  In addition, Credit Suisse allegedly committed other errors regarding "selected companies" and "selected transactions" for its fairness analysis.

On March 17, 2011, Quest and Celera executed an agreement under which Quest would make a tender offer for Celera's common stock at $8 per share.  Moreover, the acquisition agreement provided Ordoñez and Celera's other directors with six years of indemnification for misconduct while at Celera.  Ordoñez also received a one-time cash payment of approximately $2.3 million, as well as stock and salary as part of her new employment package with Quest.  On March 28, Celera filed a Schedule 14D-9 Solicitation/Recommendation Statement with the Securities and Exchange Commission, including Credit Suisse's fairness opinion and a recommendation that Celera's shareholders accept Quest's offer.  On May 17, 2011, Quest and Celera consummated the acquisition.

### 2.   SHAREHOLDER LITIGATION.

Beginning on March 22, 2011, Celera shareholders filed several putative class actions in Delaware and California to enjoin Quest's acquisition of Celera.  In April 2011, Celera shareholders filed two more putative class actions in this district — *McCreary v. Celera Corp., et al.*, 11-1618 SC (N.D. Cal) (Judge Samuel Conti), and *Andal v. Celera Corp., et al.*, 11-1769

1    SC (N.D. Cal) (same).  These two actions were then stayed pending resolution of the Delaware

2    proceeding, and in February 2013, the parties filed voluntary dismissals of those matters.

3           In each of the above actions, the plaintiffs alleged that Quest, Celera, and several of

4    Celera's directors made false or misleading disclosures in connection with the acquisition.  Each

5    action also sought to represent the same nationwide class of Celera shareholders, including

6    plaintiffs herein, Biotechnology Value Fund, L.P., Biotechnology Value Fund II, L.P.,

7    Investment 10, L.L.C., BVF Investments, L.L.C., BVF Inc., and BVF X, LLC.  At the time of

8    the acquisition, plaintiffs owned nearly 25% of all outstanding Celera shares.

9           On April 18, 2011, the Delaware proceeding settled.  Among other conditions, the

10   settlement provided for a general release of all claims relating to the acquisition.  The Delaware

11   Court of Chancery certified New Orleans Employees' Retirement System as class representative,

12   approved of the settlement as fair and reasonable, and then denied plaintiffs' request to certify

13   the class on an opt-out basis.  On appeal, the Delaware Supreme Court upheld the certification of

14   the class, but found that plaintiffs should have been provided with an opt-out right to pursue a

15   claim for money damages.  *In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 422–23 (Del. 2012).

16          **3.      THE PRESENT CLAIMS.**

17          On July 12, 2013, plaintiffs commenced this action and later filed an amended complaint.

18   The first claim is against Celera, its directors, and Credit Suisse under Section 14(e) of the

19   Securities Exchange Act, alleging that the recommendation statement contained material

20   misrepresentations, particularly as to Credit Suisse's analysis of drug royalty assets.  The second

21   claim is against Celera and its directors under Section 20(a) of the Exchange Act, asserting joint

22   and several liability for the alleged Section 14(e) violations.  The third claim is under state law,

23   for reported breach of fiduciary duty as to Credit Suisse and Celera's directors.  The fourth claim

24   is also under state law, for alleged aiding and abetting of breach of fiduciary duty as to Credit

25   Suisse and Quest.

26

27

28

United States District Court

For the Northern District of California

1    Quest, Celera, and Celera's directors now move jointly to dismiss the claims brought

2    against them.  In addition, Credit Suisse has submitted its own motion to dismiss.  Following full

3    briefing and oral argument, including supplemental briefing from both sides, this order decides

4    as follows.

### ANALYSIS

6    Defendants have requested judicial notice of various SEC filings made by both sides.

7    Under Federal Rule of Evidence 201(b), a court may take judicial notice of any fact "that is not

8    subject to reasonable dispute because it . . . can be accurately and readily determined from

9    sources whose accuracy cannot reasonably be questioned."  Accordingly, as to documents that

10   were publicly filed with the SEC by either side, defendants' request for judicial notice is

11   **GRANTED**.

12   With respect to other documents for which the parties have requested judicial notice, the

13   order does not consider these documents in resolving the present motions to dismiss.  As such,

14   requests for judicial notice as to these documents are **DENIED AS MOOT**.

15   **1.    SECTION 14(e) CLAIMS.**

16   The amended complaint alleges that Celera and its directors, as well as Credit Suisse,

17   violated Section 14(e) of the Exchange Act.  At minimum, a Section 14(e) claim requires a

18   showing that defendants made a material misrepresentation or omission in connection with a

19   tender offer. 15 U.S.C. 78n(e).  Materiality is not raised as an issue with the present motions to

20   dismiss.

21   The parties, however, assume that scienter (*i.e.*, intent or deliberate recklessness) is a

22   requirement for a Section 14(e) claim.  Although our court of appeals has not stated such a

23   requirement, "the majority of other circuits and districts to address the issue have held that the

24   scienter required under [S]ection 14(e) is the same as that required by [S]ection 10(b)," given

25   that Section 14(e) was modeled upon the antifraud provisions of Section 10(b).  *Rubke v. Capital*

26   *Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1150 (N.D. Cal. 2006) (Judge Phyllis Hamilton); *see also*

27   *Dixon v. Cost Plus*, 12-CV-02721-LHK, 2012 WL 2499931, *6 (N.D. Cal. June 27, 2012) (Judge

28

1  Lucy H. Koh).  Accordingly, the order views scienter as an element of the Section 14(e) claims below.

2                  **A.**        **Celera and Its Directors.**

3                      ***(1)***       ***American Pipe Tolling.***

4         Celera and its directors assert that the Section 14(e) claim against them must be

5  dismissed because the statute of limitations has run.  Under Section 1658(b)(1) of Title 28 of the

6  United States Code (emphasis added):

> [A] private right of action that involves a claim of fraud, deceit,
> manipulation, or contrivance in contravention of a regulatory
> requirement concerning the securities laws . . . may be brought
> not later than the earlier of--(1) *2 years after the discovery of*
> *the facts constituting the violation*; or (2) 5 years after such
> violation."

       Celera and its directors thus assert that the Section 14(e) claim is untimely because

plaintiffs were aware of the underlying facts — *e.g.*, details concerning Credit Suisse's analysis

of Celera's drug royalty assets — for more than two years before filing suit in July 2013.  For

support, Celera and its directors point to the recommendation statement from March 28, 2011,

which publicly disclosed the above details.

       This argument is unpersuasive because under *American Pipe and Construction Co. v.*

*Utah*, 414 U.S. 538, 554 (1974), the statute of limitations was tolled for claims asserted in the

Delaware class action, at least as to proposed class members and defendants named therein.  *See*

*Williams v. Boeing Co.*, 517 F.3d 1120, 1135–36 (2008).  Here, it is undisputed that *McCreary*

and *Andal* — the two putative class actions filed in this district in April 2011 — both asserted

Section 14(e) claims against Celera and its directors for material misrepresentations in the

recommendation statement.  Plaintiffs' Section 14(e) claim was thus tolled as to Celera and its

directors, such that plaintiffs timely asserted that claim here.

       Nevertheless, Celera and its directors argue that no such tolling took place because the

factual basis for *McCreary* and *Andal*'s Section 14(e) claims differs from the factual basis

underlying plaintiffs' present Section 14(e) claim.

**United States District Court**
For the Northern District of California

It is true that there is some factual variation, in that the earlier Section 14(e) claims did not allege Credit Suisse's misapplication of the Tufts study, but such variation is immaterial.  In discussing tolling under *American Pipe*, our court of appeals has explained that there is "no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled," as "one of the primary reasons a member will opt out of a class suit is that she has strong individual claims against the defendant that she believes will not be redressed by the overall class settlement." *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985).  *Tosti* thus affirmed the application of tolling to a plaintiff's discrimination claim because her claim involved the same allegations of discrimination that were made in a class suit.  So too here, inasmuch as both the earlier Section 14(e) claims and the current Section 14(e) claim allege material misrepresentations in Celera's recommendation statement.

As a result, tolling applies to the Section 14(e) claim against Celera and its directors, such that plaintiffs timely brought this claim here.

### *(2)    Scienter.*

Celera and its directors further challenge the Section 14(e) claim on the ground that the amended complaint inadequately pleads scienter on their behalf.

"Under the [Private Securities Litigation Reform Act's] heightened pleading instructions, any private securities complaint alleging that a defendant made false or misleading statement must:  (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' . . . and "(2) 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 321 (emphasis added).  A "strong inference" means that a complaint will survive a Rule 12(b)(6) motion only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the alleged facts. *Id.* at 324.

To show scienter on the part of Celera and its directors, plaintiffs cite to five allegations from the amended complaint (Opp. 28).  *First*, the amended complaint references a December 2010 e-mail, in which Ordoñez wrote, "I don't think CS got the analysis right."  This comment

United States District Court

For the Northern District of California

supposedly demonstrated Ordoñez's belief that Credit Suisse incorrectly applied the Tufts study in analyzing Celera's drug royalty assets. *Second*, the amended complaint asserts that Ordoñez actively pushed through the acquisition at a price only slightly above a "low ball" amount. *Third*, the amended complaint includes details that apparently show how the magnitude of the acquisition supports a strong inference of scienter. *Fourth*, the amended complaint references financial benefits that Ordoñez and Celera's other directors received as a result of the acquisition. *Fifth*, the amended complaint alleges that Celera announced the acquisition on the same day that it restated its financials, as to a bad-debt charge that should have been recorded before the second fiscal quarter of 2009 (Amd. Compl. ¶¶ 12, 66, 83–91, 113–129).

Viewing these allegations collectively, the order finds that the amended complaint does not plead a strong inference of scienter against Celera and its directors. In fact, at least one central allegation — concerning the December 2010 e-mail from Ordoñez — is *not* as plaintiffs claim. Normally, the scope of review on a Rule 12(b)(6) motion would be limited to the complaint, but "[u]nder the incorporation by reference doctrine, we also consider documents submitted by [d]efendants that were referenced in the complaint and whose authenticity has not been questioned." *America West*, 320 F.3d at 925 n.2.

The December 2010 e-mail is such a document. Cited in the amended complaint, this e-mail was provided as an exhibit to defendants' reply declaration, after plaintiffs discussed the e-mail in their opposition to defendants' motions to dismiss (Amd. Compl. ¶ 113; Polovoy Reply Decl. Exh. A). Moreover, even though they had the opportunity to do so in their surreply and at oral argument, plaintiffs have made no challenge to the authenticity of the e-mail as presented by defendants (Surreply 8). This order thus considers the e-mail, which was as follows (emphasis added):

> Thanks, David. It looks, from my reading, that the BTK inhibitor is zooming by HDAC. According to the RBC report of June 16, 2010, they put the value of the BTK inhibitor at $7/share and the HDAC and FVIIa at $2/share each. This is when PCYC was trading at $6.51/share, with 56 MM shares outstanding. Most other analysts seem to agree and *I don't think CS got the analysis right*. Push back on them. They had listed FVIIa as an anti-coagulant. It's not clear they read the material you provided. It would seem these drugs will get commercialized in 2014/15, if they are successful.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Although the December 2010 e-mail reflected Ordoñez's doubt about Credit Suisse's analysis as to FVIIa's classification as an anti-coagulant, and as to other drug assets (*i.e.*, BTK inhibitor, HDAC, and FVIIa), the e-mail did not show, as argued by plaintiffs, knowledge that Credit Suisse *had misapplied the Tufts study's probabilities*. This e-mail made no mention of the Tufts study, much less the study's probabilities. Indeed, although plaintiffs argue that the December 2010 e-mail supposedly showed a belief that Credit Suisse had misapplied the Tufts study, Credit Suisse did not commit its error until later — March 7, 2011 (Amd. Compl. ¶ 111).

Nor is scienter found in the allegations that Ordoñez pushed through the acquisition at a "low ball" price and that Celera announced the acquisition on the same day that it restated its financials. Of note, the amended complaint does not provide details as to how or by what amount Celera restated its financials. Given that these allegations concern Ordoñez's involvement in the acquisition and Celera's timing of announcements, they do not bridge the gap to a strong inference that either Ordoñez or Celera's other directors knew of or intentionally disregarded Credit Suisse's misapplication of the Tufts study's probabilities.

Plaintiffs further argue that the third allegation from above — regarding details about the magnitude of the acquisition — warrants a sufficient inference of scienter. For support, they cite to our court of appeals' decision from *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (emphasis added):

> Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter *when* made in conjunction with detailed and specific allegations about management's exposure to factual information within the company.

Plaintiffs then contend that the amended complaint demonstrates scienter, based on its allegations concerning Ordoñez's involvement in the acquisition, Celera's recommendation of the acquisition to shareholders, the Celera directors' access to Credit Suisse's analysis before Celera filed the recommendation statement, and the importance of the acquisition to Celera and its directors.

Such a contention falls short because it ignores what constitutes "detailed and specific allegations about management's exposure to factual information within the company." *Killinger* provided examples of such allegations, pointing to cases in which the complaint detailed how the defendants monitored or actually knew about the information that became the subject of reportedly false statements. In *Nursing Home Pension Fund, Local 144 v. Oracle Corporation*, for instance, the defendant's CEO allegedly said: "All of our information is on one database. We know exactly how much we have sold in the last hour around the world." 380 F.3d 1226, 1231 (9th Cir. 2004). Our court of appeals recognized that such an allegation was adequate to show scienter under the PSLRA because the allegation "included details about the defendants' access to information within the company." *Killinger*, 542 F.3d at 785.

In contrast, the amended complaint here does not allege sufficient details concerning Celera and its directors' access to information that would have revealed the errors in Credit Suisse's analysis. Indeed, there are no specific allegations of admissions or statements *made by defendants* to show that Celera and its directors knew about the information underlying Credit Suisse's analysis. The closest that the amended complaint gets is alleging that Credit Suisse presented different probabilities to Celera's board of directors between February and March 2011, and that "Credit Suisse's errors should have been particularly obvious . . . given that, since 2010, the Celera [b]oard had received a steady stream of estimates valuing Cat-K significantly higher than the value incorporated in the final analysis Credit Suisse presented to the [b]oard on March 17, 2011" (Amd. Compl. ¶¶ 111–12). This raises a suspicion but not a strong inference of guilty knowledge.

Here the order pauses to note a different aspect of plaintiffs' "magnitude" argument. In essence, plaintiffs further contend that the acquisition was "the most significant transaction in Celera's history," and that this therefore supports a strong inference that Celera and its directors either knew of or recklessly disregarded Credit Suisse's errors in filing the recommendation statement. For support, plaintiffs cites *In re Diamond Foods, Inc., Securities Litigation*, C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012).

This argument is unavailing.  As a preliminary matter, the undersigned judge in *Diamond Foods* found that "[t]he magnitude of the *wrongful accounting*" (*i.e.*, a report of $50.2 million in net income instead of a $9.8 million loss) was but one factor in finding a strong inference of scienter.  *Id.* at *7–8 (emphasis added).  By comparison, the amended complaint alleges that Credit Suisse erred in applying probabilities (*e.g.*, using 53% instead of 67% for Phase III drugs), and that such error had a "material impact" on Credit Suisse's analysis of drug royalty assets (Amd. Compl. ¶¶ 106, 142).  While this issue concerning materiality only arose during oral argument, and not in the parties' briefing, it certainly appears that Credit Suisse mangled its analysis of the drug royalty assets (even defendants do not even try to defend this).  Nonetheless, the impact on the bottom line values here was small compared to the whopping impacts in *Diamond Foods*.  Given that the amended complaint does not allege concrete details about the alleged "material impact," such as how much value Celera's drug royalty assets would have had in 2011 under the correct Tufts study probabilities, plaintiffs' "magnitude" argument does not afford a strong inference of scienter.

Plaintiffs' fourth allegation — as to financial benefits for Ordoñez and Celera's other directors — also does not sufficiently demonstrate scienter.  It is true that the amended complaint alleges that Ordoñez received a $2.3 million "change-in-control" payment as part of her employment agreement with Quest, in addition to salary and stock.  This might well be viewed as a payoff to her.  But as to other Celera's other directors, the amended complaint fails to provide specific details, asserting only that "other executives also received lucrative employment agreements" and that they reportedly "secured millions of dollars of additional payments that Quest previously was unwilling to make" (*id.* ¶¶ 129–130).  Even considering the amended complaint as a whole, these assertions are too generalized to establish a strong inference that Celera and its directors intentionally or recklessly disregarded Credit Suisse's erroneous analysis.  Indeed, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (emphasis in original).

11

United States District Court

For the Northern District of California

1    Finally, the order notes that the amended complaint alleges the following (Amd. Compl.

2 ¶ 111) (emphasis in original):

3    First, the clear disparity between Credit Suisse's prior
     probability adjustments, which it presented to the Celera Board
4    as recently as February 3, 2011, and the substantially lower
     probability adjustments underlying the erroneous analysis *that*
5    *were derived from the same Tufts Study* — which Credit Suisse
     presented to the Board just over one month later, during its
6    meetings of March 7 and 17, 2011 — either did alert, or should
     have alerted, [Celera's directors] to Credit Suisse's stark errors.
7
          It is concerning that Credit Suisse altered the probability assessments between February
8
and March 2011, even though these adjustments "were derived from the same Tufts study."  The
9
amended complaint, however, makes no other reference to Credit Suisse's alleged presentations
10
to Celera's board of directors before March 2011.  Nor does the amended complaint provide
11
specific details as to how much disparity there was in value, as between Credit Suisse's
12
probability adjustments from February 2011 and the probability adjustments presented to
13
Celera's board of directors in March 2011.   Without such particularized details, the above
14
allegation does not afford a strong inference that the difference in probability adjustments alerted
15
Celera and its directors to Credit Suisse's valuation errors.
16
          As to Celera and its directors, the motion to dismiss the Section 14(e) claim is thus
17
**GRANTED**, subject to the last paragraph of this order.  Accordingly, the order does not reach
18
defendants' other arguments as to reliance and the making of misrepresentations in the
19
recommendation statement.
20
               **B.       Credit Suisse.**
21
               ***(1)       Statute of Limitations.***
22
          Without repeating the discussion from above, Credit Suisse asserts the same arguments
23
made by Celera and its directors as to the statute of limitations.  The outcome, however, is
24
slightly different here, in that the order must first determine whether the statute of limitations
25
began to run before engaging in the *American Pipe* analysis.
26

27

28

                                                  12

In response, plaintiffs contend that at least as to Credit Suisse, the statute of limitations did not start running until September 2011, after plaintiffs signed a confidentiality order and received the discovery record from the Delaware proceeding.  According to plaintiffs, it was only at this point that they discovered sufficient facts concerning Credit Suisse's scienter in erroneously analyzing Celera's drug royalty assets:  namely, that (1) Credit Suisse misapplied the Tufts study, after correctly applying the study previously; (2) Credit Suisse repeatedly dissuaded Celera from pursuing transactions other than the sale fo the entire company; and (3) Credit Suisse noted internally that de-emphasizing the value of Celera's drug royalty assets would facilitate a transaction with Quest (Amd. Compl. ¶¶ 49–65, 92–109, 131–212).

The order disagrees.  As a preliminary matter, the second and third facts from above do not demonstrate Credit Suisse's scienter, and therefore do not affect *when* the statute of limitations began to run, as based on the discovery of facts showing scienter under plaintiffs' argument.  Although it is true that the amended complaint alleges how Credit Suisse dissuaded Celera from certain transactions and considered valuating Celera's drug royalty assets in a lesser way, such allegations do not show how Credit Suisse knew or intentionally disregarded its reported errors in analyzing the drug royalty assets.

Furthermore, even if this order considers the first fact from above, plaintiffs' position still fails.  This is because "discovery," as referenced in Section 1658(b)(1), "encompasses not only those facts that the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known."  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010).  Here, Credit Suisse points out — and plaintiffs do not dispute — that Celera's recommendation statement publicly disclosed Credit Suisse's methodology for valuing Celera's drug royalty assets, the key inputs for that analysis, and the projected yearly revenue stream for the drug assets.  In light of this information, "a reasonably diligent plaintiff" would have been able to calculate the value of Celera's drug royalty assets and know that Credit Suisse erred in evaluating those assets.

1    Plaintiffs counter that "a reasonably diligent plaintiff" did not need to perform an

2    independent analysis of Celera's recommendation statement to prevent the statute of limitations

3    from running.  For support, plaintiffs rely on two decisions, one of which comes from the

4    undersigned judge.  *See Int'l Union of Operating Engineers, Stationary Engineers Local 39*

5    *Pension Trust Fund v. Bank of New York Mellon Corp.*, C 11-03620 WHA, 2012 WL 476526

6    (N.D. Cal. Feb. 14, 2012); *and Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007).

7    Both decisions are distinguishable from the situation here.  In *Bank of New York*, the

8    plaintiff sufficiently pled tolling of the statute of limitations in part because the plaintiff "had

9    little reason to believe, prior to the unsealing of the whistleblower complaints in 2011, that it had

10   been deceptively charged fictitious FX rates."  2012 WL 476526, *7.  Likewise in *Ryan*, the

11   plaintiff had no reason to know about the alleged deception, given that the defendants

12   intentionally falsified public filings to prevent the plaintiff from gaining material, relevant

13   knowledge.  918 A.2d at 360.  In contrast, plaintiffs here *did* have reason to believe that Credit

14   Suisse's analysis of Celera's drug royalty assets was lacking, having stated in their April 2011

15   SEC filing "that the extraordinary value of [Celera's] passive drug royalties were not reflected in

16   the Offer Price and that the Merger should be reconstructed to carve out these non-strategic drug

17   royalties" (Hibbard Exh. E at 9).

18   The order thus finds that as of March 28, 2011, plaintiffs should have discovered the

19   facts underlying their Section 14(e) claim against Credit Suisse such that the statute of

20   limitations has now expired.  Credit Suisse's motion to dismiss must therefore be granted *unless*

21   the amended complaint sufficiently alleges some form of tolling of the statute of limitations.

22                    *(2)      American Pipe Tolling.*

23   Plaintiffs assert two different bases for tolling of the statute of limitations, the first being

24   *American Pipe*.  Specifically, plaintiffs argue that the statute of limitations was tolled during the

25   pendency of the two putative class actions filed in this district:  *McCreary* and *Andal*.  Filed in

26   April 2011, both of these actions asserted Section 14(e) claims against Celera and its directors

27   for alleged misrepresentations in the recommendation statement, and both actions were then

28

14

1    stayed until the parties filed voluntary dismissals in February 2013.  It was after this point that

2    the statute of limitations began to take effect, at least in plaintiffs' view.

3          *American Pipe*, however, cannot apply to Credit Suisse.  This is because Credit Suisse

4    was not a defendant in either of the two putative class actions above.  Indeed, plaintiffs concede

5    that "*American Pipe* tolling typically does not apply to claims against a defendant not named in

6    the class suit" (Opp. 22).

7          Nonetheless, plaintiffs request an extension of *American Pipe* based on "the

8    extraordinary circumstances" of being legally precluded from bringing a Section 14(e) claim

9    against Credit Suisse, due to the Delaware proceeding's class settlement and plaintiffs' eventual

10   opt-out of that class in February 2011 (*ibid.*).  The order denies such a request, in light of other

11   decisions that have declined to toll claims against defendants who were not named in the class

12   action.  *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, M 07-1827 SI, 2012 WL 3155693,

13   *3 (N.D. Cal. Aug. 2, 2012) (Judge Susan Illston).  *American Pipe* thus does not provide

14   plaintiffs with relief from the statute of limitations.

                      *(3)     Equitable Tolling.*

16         Plaintiffs' second basis for tolling concerns equitable tolling.  Although plaintiffs did not

17   discuss this form of tolling in their opposition, the undersigned judge permitted both sides to

18   submit supplemental briefing on this issue after plaintiffs raised equitable tolling during oral

19   argument.

20         Our court of appeals has addressed equitable tolling, and in doing so, stated that "[a]

21   motion to dismiss based on the running of the statute of limitations period may be granted only if

22   *the assertions of the complaint*, read with the required liberality, would not permit the plaintiff to

23   prove that the statute was tolled."  *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204,

24   1206–07 (9th Cir. 1995) (emphasis added).  "It is not necessary that the complaint explicitly

25   plead equitable tolling," if "*facts are alleged* suggesting the applicability of equitable tolling to

26   suspend the running of the statute [of limitations]."  *Audio Marketing Services, S.A.S. v. Monster*

27   *Cable Products, Inc.*, C 12-04760 WHA, 2013 WL 633202, *6 (N.D. Cal. Feb. 20, 2013)

28   (emphasis added).

15

In their supplemental briefing, plaintiffs allege that their Section 14(e) claim is timely as to Credit Suisse because equitable tolling applied for 18 months — from August 15, 2011 to February 1, 2013. According to plaintiffs, this is the time period during which the Delaware Court of Chancery issued an injunction that barred all putative class members — including plaintiffs — from opting out of the class and bringing a lawsuit against Credit Suisse. To that end, plaintiffs have submitted filings from the Delaware proceeding to show that they were so enjoined.

The problem, however, is that although plaintiffs' current arguments may well support equitable tolling, those arguments are not found within the amended complaint. Indeed, the amended complaint makes only one explicit reference to equitable tolling: "Plaintiffs' claims are also subject to equitable tolling due to the surreptitious nature of [d]efendants' misconduct, which [d]efendants concealed from [p]laintiffs and other investors throughout the relevant period" (Amd. Compl. ¶ 156). Yet there are no facts asserted within the amended complaint that support the allegation of Credit Suisse's "surreptitious" misconduct or this theory of equitable tolling.

Nor does the amended complaint allege facts to support plaintiffs' current allegations of equitable tolling, as based on the Delaware Court of Chancery's injunction. Although plaintiffs cite to several portions of the amended complaint for support, these portions have nothing to do with the injunction; rather, they primarily address how other Celera shareholders filed putative class actions to enjoin the acquisition, how the Delaware proceeding resulted in class certification and settlement to release claims against *Celera and its directors*, and how plaintiffs successfully opted out of the Delaware class following an appeal to the Delaware Supreme Court (*id.* ¶¶ 16–20, 193). Because the amended complaint makes no mention of the injunction from the Delaware Court of Chancery, or any facts to support plaintiffs' current arguments that they were legally precluded from bringing suit against Credit Suisse, the order finds that the assertions of the amended complaint do not permit plaintiffs to prove equitable tolling, at least on this record. *Supermail Cargo*, 68 F.3d at 1206.

16

As to Credit Suisse, the motion to dismiss the Section 14(e) claim is **GRANTED**, subject to the last paragraph of this order.  It is therefore unnecessary to consider Credit Suisse's other arguments regarding scienter and the making of the alleged misrepresentations.

**2.    SECTION 20(a) CLAIMS.**

The amended complaint also alleges that Celera and its directors violated Section 20(a) of the Exchange Act, by virtue of the alleged Section 14(e) violations.  15 U.S.C. 78t(a).  To demonstrate a prima facie case under Section 20(a), a plaintiff must prove:  "(1) a primary violation of federal securities laws . . . and (2) that the defendant exercised actual power or control over the primary violator."  *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because this order dismisses the Section 14(e) claims, there is no "primary violation of federal securities laws."

The motion to dismiss the Section 20(a) claims as to Celera and its directors is thus **GRANTED**, subject to the last paragraph of this order.

**3.    STATE LAW CLAIMS.**

Given the dismissal of the Section 14(e) and Section 20(a) claims, defendants object to supplemental jurisdiction over the remaining state law claims.  In regards to Credit Suisse's alleged errors with its "selected companies" and "selected transactions" analysis, the amended complaint asserts breach of fiduciary duty by Credit Suisse and Celera's directors, as well as aiding and abetting of breach of fiduciary duty by Credit Suisse and Quest.

A district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. 1367(c)(3).  "To decline jurisdiction under [Section] 1367(c)(3), the district court must first identify the dismissal that triggers the exercise of discretion and then explain how declining jurisdiction serves the objectives of economy, convenience and fairness to the parties, and comity."  *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint.*, Inc., 333 F.3d 923, 925 (9th Cir. 2003).  Our Supreme Court has also instructed that "if the federal claims are dismissed before trial, even though not insubstantial in a

United States District Court

For the Northern District of California

1   jurisdiction sense, the state claims should be dismissed as well." *United Mine Workers of*

2   *America v. Gibbs*, 383 U.S. 715, 726 (1966).

3         Plaintiffs contend that judicial efficiency warrants supplemental jurisdiction because of

4   "the long history of this case and the fact that the proceedings are underway here, with a pretrial

5   schedule and trial date set" (Opp. 31 n.18).  This glides over the fact that plaintiffs only filed the

6   amended complaint approximately four months ago.  Moreover, there is ample time before trial

7   would begin on January 14, 2015, such that there are no concerns with economy or convenience

8   and fairness to the parties to justify supplemental jurisdiction here.

9         Because the federal claims have been dismissed, the motion to dismiss the state law

10  claims is **GRANTED**, subject to the last paragraph of this order.  This is without prejudice to

11  pursuing these claims in state court.

                      **CONCLUSION**

13        To the extent stated, defendants' motions to dismiss are **GRANTED**.  Defendants' request

14  for judicial notice of documents that have been publicly filed with the SEC is **GRANTED**.  The

15  parties' requests for judicial notice of other documents are **DENIED AS MOOT**.

16        Plaintiffs may file a motion on the normal 35-day track seeking leave to file amended

17  pleadings that might save their claims.  Such a motion is due by **5 PM ON JANUARY 17, 2014**.  A

18  proposed second amended complaint must be appended to that motion.  Furthermore, the motion

19  should clearly explain how the amendments to the present amended complaint cure the

20  deficiencies identified herein.  If the proposed amendments do not address these deficiencies,

21  they will not be allowed.  Plaintiffs should plead their best case.

23        **IT IS SO ORDERED.**

25  Dated:  December 20, 2013.

26                                    WILLIAM ALSUP
                                  UNITED STATES DISTRICT JUDGE