United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BIOTECHNOLOGY VALUE FUND, L.P., BIOTECHNOLOGY VALUE FUND II, L.P., INVESTMENT 10, L.L.C., BVF INVESTMENTS, L.L.C.; BVF INC., and BVF X, LLC,

Plaintiffs,

v.

CELERA CORPORATION, CREDIT SUISSE SECURITIES (USA) LLC, KATHY ORDOÑEZ, RICHARD H. AYERS, WILLIAM G. GREEN, PETER BARTON HUTT, GAIL M. NAUGHTON, WAYNE I. ROE, and BENNETT M. SHAPIRO,

Defendants.
_______________________________________/

No. C 13-03248 WHA

**CORRECTED ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR LEAVE AND JUDICIAL NOTICE**

## INTRODUCTION

In this action asserting claims under federal securities law and state law, plaintiffs move for leave to file a second amended complaint. Both sides also move for judicial notice of numerous documents. To the extent stated below, all motions are **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

The background of this action is set forth in a prior order (Dkt. No. 94). In brief, this action stems from the 2011 sale of defendant Celera Corporation. Plaintiffs are former Celera

United States District Court
For the Northern District of California

shareholders who claim that the sale was done at too low of a price, due to alleged misrepresentations in Celera's recommendation statement and the fairness opinion appended thereto. The remaining defendants are Credit Suisse Securities (USA) LLC, Kathy Ordoñez, and several Celera directors. Although Ordoñez also served as a Celera director, this order only refers to her as Celera's CEO herein.*

A short recap of the sale is needed. In March 2010, Credit Suisse signed an engagement letter with Celera. Under the terms of that letter, Credit Suisse would advise on potential strategic transactions for Celera. Credit Suisse, in exchange, would receive an initial payment of $250,000, as well as one million dollars for issuing a fairness opinion and a fee for any "transaction" made. If no transaction was made, Credit Suisse would receive no transaction fee. In the end, Credit Suisse received a transaction fee of $8.6 million for its services to Celera, bringing its total compensation for the acquisition to approximately $8.8 million.

In May 2010, Quest submitted a formal bid to acquire Celera, later increasing its offer to $10.25 per share. Quest, however, then withdrew that bid, only to return months later with a lower offer of seven dollars per share on November 22, 2010. On January 3, 2011, Ordoñez contacted Quest's CEO to negotiate, and Celera made a final offer of eight dollars per share on February 17, 2011.

Credit Suisse then presented its fairness opinion to the Celera board of directors, concluding that eight dollars per share was a fair acquisition price. Quest and Celera then entered into an acquisition agreement, under which Ordoñez would (and did) receive a $2.3 million "change-in-control payment," a senior executive position with Quest, and stock-based compensation. On March 28, 2011, Celera filed a Schedule 14D-9 Solicitation/Recommendation Statement with the Securities and Exchange Commission, including Credit Suisse's fairness opinion and a recommendation that Celera shareholders accept Quest's offer. The acquisition was consummated shortly thereafter.

---

* Quest Diagnostics Incorporated, Celera's acquirer, and Jean-Luc Bélingard, a Celera director, would no longer be defendants under the second amended complaint.

United States District Court
For the Northern District of California

Meanwhile, Celera shareholders opposed the acquisition by filing putative class actions in Delaware and other jurisdictions. The Delaware litigation, however, settled on April 18, 2011, on the condition that all claims relating to the acquisition — including those by plaintiffs — would be released. The Delaware Court of Chancery then approved of the settlement as fair and reasonable, and denied plaintiffs' request to certify the class on an opt-out basis. On appeal, the Delaware Supreme Court upheld the certification of the class, but found that plaintiffs should have been provided with an opt-out right to pursue their own claim for money damages. *In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 422–23 (Del. 2012). Plaintiffs were consequently deemed to have opted out of the Delaware class as of February 1, 2013.

On July 12, 2013, plaintiffs commenced this action (it is not a class action). An order then dismissed the first amended complaint under Federal Rule of Civil Procedure 12(b)(6), due to problems with scienter and timeliness; as a result, the claims made under Section 14(e) and 20(a) of the Securities Exchange Act were found to be deficient, with the remaining fiduciary duty claims dismissed for declination of supplemental jurisdiction.

As permitted by the dismissal order, plaintiffs now move for leave to file a second amended complaint. The first claim is against Credit Suisse and all Celera defendants under Section 14(e), for alleged misrepresentations in the recommendation statement and its appended amendments. Specifically, the alleged misrepresentations involve Credit Suisse's valuation of Celera's drug royalty assets — such as odanacatib ("Cat-K") and ibrutinib — as well as Celera's efforts to seek alternative strategic transactions. The second claim is against all Celera defendants under Section 20(a), based on the alleged Section 14(e) violations. The third is under state law, for breach of fiduciary duty by Ordoñez and the Celera directors. The fourth is also under state law, for aiding and abetting of that breach by Credit Suisse. In addition, both sides move for judicial notice. Following full briefing and oral argument, the order decides all motions below.

United States District Court
For the Northern District of California

## ANALYSIS

### 1. MOTIONS FOR JUDICIAL NOTICE.

As noted above, both sides request judicial notice of numerous documents, including: (1) a 2002 study using data from the Tufts University Center for the Study of Drug Development; (2) filings with the Commission; (3) submissions from the Delaware litigation and other cases; and (4) documents referenced in the second amended complaint. Under Federal Rule of Evidence 201(b), a court may take judicial notice of a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Tufts study, as well as documents that have been publicly filed with the Commission, are available online. The motions for judicial notice of these documents are thus **GRANTED**.

With respect to other documents for which the parties request judicial notice, the order does not need to consider those documents in resolving the present motion for leave. As to these documents, the motions for judicial notice are accordingly **DENIED AS MOOT**.

### 2. MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT.

Under Federal Rule of Civil Procedure 15(a)(2), leave to amend a pleading should be freely given when justice so requires. But leave may be denied "where the amendment would be futile." *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). According to defendants, such futility exists here because the second amended complaint does not sufficiently allege the Section 14(e) claim or the state law claims.

#### A. Section 14(e) Claim.

At minimum, a Section 14(e) claim requires a showing that defendants made a material misstatement or omission in connection with a tender offer. 15 U.S.C. 78n(e). In this connection, defendants challenge the Section 14(e) claim in four ways. The order addresses each challenge in turn.

United States District Court
For the Northern District of California

***(1) Statute of Limitations.***

Only as to itself, Credit Suisse argues that the Section 14(e) claim is untimely because the applicable two-year statute of limitations has run. *See* 28 U.S.C. 1658(b)(1). For support, Credit Suisse points to the recommendation statement filed on March 28, 2011, as the event triggering that two-year period.

The second amended complaint, however, alleges "circumstances beyond [plaintiffs'] control." *Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1193–94 (9th Cir. 2001). Indeed, there are allegations that equitable tolling applied from August 15, 2011 to February 1, 2013, such that the statute of limitations stopped running for approximately seventeen months. According to the second amended complaint, the Delaware Court of Chancery entered a scheduling order on August 15, 2011, enjoining all class members — including plaintiffs — from suing Celera's "financial or investment advisors, advisors, consultants, investment bankers, [or] entities providing any fairness opinion" (*i.e.*, Credit Suisse). The Delaware trial court then ordered a release of plaintiffs' claims, so that plaintiffs were "legally precluded from asserting its claims" against Credit Suisse. This lasted until February 1, 2013, the date on which plaintiffs, after a successful appeal to the Delaware Supreme Court, were deemed to have opted out of the Delaware class (Second Amd. Compl. ¶¶ 263–74).

Nonetheless, Credit Suisse avers that plaintiffs did not diligently pursue their rights throughout the *entire* period at issue. In particular, Credit Suisse suggests that plaintiffs should have brought their suit sooner, *i.e.*, between March 28 and August 15, 2011, or between February 1 and June 12, 2013.

This order disagrees. At minimum, the second amended complaint sufficiently alleges that equitable tolling applied from August 15, 2011 through February 1, 2013. As a result, that tolled period was excluded from the statute of limitations, such that the Section 14(e) claim against Credit Suisse was timely brought. *See Socop-Gonzalez*, 272 F.3d at 1194; *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1113 (9th Cir. 2006). Moreover, while Credit Suisse cites to decisions that state how "important" it is to pursue their rights diligently, even "*before* the external impediment" arises, those decisions involve federal habeas petitions and

are thus distinguishable. *See, e.g.*, *Roy v. Lampert*, 465 F.3d 964, 972 (9th Cir. 2006). The futility objection is rejected, at least at this pleading stage.

***(2) Making of the Alleged Misrepresentations.***

Credit Suisse — as well as the Celera directors (*i.e.*, the directors other than Ordoñez) — also argue that they did not "make" any alleged misrepresentation through the recommendation statement; they are thus not liable under Section 14(e), at least in their view. *See* 15 U.S.C. 78n(e). It is uncontested, however, that Celera and Ordoñez may be deemed "makers" of the alleged misrepresentations, given that Celera filed (and Ordoñez signed) the recommendation statement itself.

Both sides further assume that *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), applies here. *Janus* stated (emphasis added):

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with *ultimate authority over the statement*, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, *attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by — and only by — the party to whom it is attributed*. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit — or blame — for what is ultimately said.

Here, the second amended complaint alleges several misrepresentations in the recommendation statement that are attributable to Credit Suisse. For example, the recommendation statement described Credit Suisse's valuation of Celera's drug royalty assets (Second Amd. Compl. ¶ 184) (emphasis added):

> Credit Suisse calculated the present value of the Company's interest in its non-commercial, development stage drug assets based on forecasts of launch dates, peak sales and milestone and royalty payments for the Company's non-commercial, development stage drug assets by the Company's management and publicly available research analyst reports. In performing this analysis, Credit Suisse combined traditional discounted cash flow methodology with estimated

> clinical-trial success rates to yield probability-adjusted after-tax free cash flows related to each drug asset. *The probability rates for clinical trial success were derived from a study published in 2002 by the Milken Institute based on data from the Tufts University Center for the Study of Drug Development, and were not based on any judgment with respect to the particular drug assets*. These cash flows were discounted at a range of 13.0% to 15.0% based on the Company's estimated weighted average cost of capital. Credit Suisse chose this range of discount rates as appropriately illustrative based upon its assessment of certain financial metrics for the Company and other companies it deemed comparable.

The recommendation statement then indicated that under Credit Suisse's valuation analysis, the implied per share equity reference range for Celera's stock was $7.65–$8.55 (including drug assets). As such, this order finds that the descriptions of Credit Suisse's valuation analysis are attributable to, and thus made by, Credit Suisse.

Credit Suisse counters with three points. *First*, it argues that it lacked "ultimate authority" over the recommendation statement, such that it cannot be the maker of any misrepresentation contained therein. Not so. Attribution is "strong evidence" that a statement was made by "the party to whom it is attributed." *Janus*, 131 S. Ct. at 2302. And, such attribution has been alleged here, given that the recommendation statement specifically attributed descriptions of the valuation analysis to Credit Suisse.

*Second*, Credit Suisse asserts that Celera's statutory obligation to file the recommendation statement precludes liability on Credit Suisse's behalf. For support, Credit Suisse relies on *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011). While *Reese* observed that certain filings were not attributable to the defendant there, in part because a third party bore the statutory obligation to make those filings, this was but one observation among several considered factors. In any event, *Reese* did not hold that one's statutory obligation to file always precluded another's liability for alleged misrepresentations. To the contrary, attribution can still identify who made an alleged misrepresentation, all with the understanding that the statement would be shared with plaintiffs and others. *Janus*, 131 S. Ct. at 2305 n.11.

United States District Court
For the Northern District of California

*Third*, Credit Suisse contends that its fairness opinion was not made directly to Celera shareholders. This contention is also unpersuasive. Other parts of the recommendation statement attributed descriptions of the valuation analysis to Credit Suisse, and were made directly to Celera shareholders (Second Amd. Compl. ¶ 184). The language of Section 14(e) does not require any more directness than occurred here, given that it imposes liability for "any" material misrepresentation in connection with a tender offer. 15 U.S.C. 78n(e). To find otherwise would contradict Section 14(e)'s function as a "broad antifraud prohibition . . . modeled on the antifraud provisions of § 10(b) of the [Exhange] Act and Rule 10b–5." *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 10–11 (1985).

Yet the outcome for the Celera directors (*i.e.*, the directors other than Ordoñez) is different. Indeed, these directors did not issue or sign the recommendation statement. Moreover, the second amended complaint does not identify what *misrepresentation* the Celera directors supposedly made.

In their reply, plaintiffs disagree, citing to three paragraphs of the second amended complaint (Reply 23; Second Amd. Compl. ¶¶ 244, 305, 278). But none of those paragraphs support their argument. For instance, the second amended complaint alleges (*id.* ¶ 278):

> [T]he [r]ecommendation [s]tatement contained misstatements or omissions of material fact concerning . . . (ii) Celera's purported efforts to seek a strategic transaction other than a sale of the whole Company, and (iii) Celera's purported efforts "to exclude the drug assets from the sale to Quest or to get a contingent value right for Celera stockholders."

This allegation thus attributes misrepresentations to Celera, *not* its directors. In fact, the quote about efforts "to exclude the drug assets from the sale to Quest or to get a contingent value right for Celera stockholders" was made only as to what Celera did (*id.* ¶ 252; Kruse Exh. 14 at 6).

Other allegations in the second amended complaint also do not attribute misrepresentations to the Celera directors, focusing instead on how "Celera issued the [r]ecommendation [s]tatement on March 28, 2011, which Ordoñez signed," and how "Credit Suisse performed [analyses] in arriving at its 'implied per share equity reference range . . ."

(*id.* ¶¶ 244, 305). It is true that one allegation describes how a Celera director (Ayers) reviewed drafts of the recommendation statement and provided comments, but this does not mean that the Celera directors issued the recommendation statement itself (*id.* ¶ 244). Nor can plaintiffs find relief in the following part of the recommendation statement: "The Company Board hereby recommends that the Company's stockholders accept the Offer . . . and thereby approve the Merger . . ." (Pollak Exh. 2 at 13, 27). No alleged misrepresentation exists there for the Celera directors.

So too for the amendments appended to the recommendation statement. In their reply, plaintiffs point to one of those amendments — an investor presentation dated April 19, 2011 — and argue that the Celera directors can be liable for statements therein. But again, there are no alleged misrepresentations in that presentation. At best, there are statements that Celera's board of directors evaluated strategic alternatives, reviewed Credit Suisse's valuation analysis, and determined Quest's offer to be in the best interests of Celera shareholders in light of the risks and challenges with Celera's business (Kruse Exh. 14 at 5–7). There is no allegation that the Celera directors in fact did not do any of those things.

As a final resort, plaintiffs raise the group pleading rule, citing to a decision from the undersigned judge. *See Levine v. Entrust Grp., Inc.*, C 12-03959, 2013 WL 2606407, *5 (N.D. Cal. June 11, 2013). The second amended complaint also claims that each alleged misrepresentation is "group-published" information from the Celera directors (Second Amd. Compl. ¶¶ 256–58). *Levine*, however, is inapposite, as it declined to apply the group pleading rule, and in any event, did not address the effect of *Janus*. In fact, our court of appeals has discussed *Janus* only once to date. *See Reese*, 643 F.3d at 694 n.8 (emphasis added). Albeit in the Rule 10b–5 context, *Reese* noted:

> The insufficiency of Reese's pleadings are reinforced by the Supreme Court's recent opinion in [*Janus*], *which sets the pleading bar even higher in private securities fraud actions seeking to hold defendants primarily liable for the misstatements of others* . . . . There, the Court explained that "[o]ne who prepares or publishes a statement on behalf of another is not its maker" because "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." [] Accordingly, the Court held

United States District Court
For the Northern District of California

> that, "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it."

Given that plaintiffs already argue under the standard set forth by *Janus*, this order does the same, finding that the Celera directors have not made alleged misrepresentations under the second amended complaint.

***(3) Scienter.***

Credit Suisse, Celera, and Ordoñez further attack the Section 14(e) claim for failure to allege scienter. Here, a "strong inference" of scienter is required, such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Viewing the allegations collectively, the order finds that a strong inference of Credit Suisse's scienter has been pled. Indeed, the second amended complaint alleges that Credit Suisse was financially motivated to pursue a complete acquisition of Celera, as opposed to a spin-off transaction for Celera's drug royalty assets alone. Mark Page, a Credit Suisse director who oversaw work on the acquisition, testified at his deposition that he did not think such a spin-off transaction would have satisfied the definition of "transaction" under Credit Suisse's engagement letter. As such, the suggestion is that Credit Suisse was motivated to push through Celera's acquisition, even at a lowered price, so that it could salvage a transaction fee. To this end, the second amended complaint highlights Credit Suisse's receipt of $8.6 million for just the transaction fee (Second Amd. Compl. ¶¶ 6, 91).

But there is more. The second amended complaint further alleges scienter based on the *timing* of Credit Suisse's errors in valuing the drug royalty assets. From April 2010 to February 2011, Credit Suisse calculated Cat-K's chances of reaching the market by using an average probability from sixteen studies. As a Phase III drug, Cat-K's average probability was in the range of 60–70%; a Phase I drug, like ibrutinib, had an average probability of 26% (*id.* ¶ 166). But after the offer price dropped from $10.25 to seven dollars, Credit Suisse needed a way to justify the lower price (which ended up at eight dollars). It seized upon a

United States District Court
For the Northern District of California

different study of probabilities (*i.e.*, the Tufts study), which in itself was not deceptive, but then manipulated it to materially reduce the supposed probability of Cat-K reaching the market. Thus, even though Credit Suisse had previously calculated Cat-K's average probability to be in the 60–70% range, it then calculated the probability to be 53% under the Tufts study; for ibrutinib, the probability calculation went down even more, from 26% to three percent.

Here is how the Credit Suisse manipulation came down. Under the Tufts study, the probabilities for a drug to reach market were as follows: 20% for Phase I drugs, 30% for Phase II drugs, 67% for Phase III drugs, and 81% for FDA NME drugs. Credit Suisse manipulated these probabilities by multiplying, for example, the 20% (for Phase I) by the 30% (for Phase II), the 67% (for Phase III), and the 81% (for FDA NME) to arrive at three percent for a Phase I drug, all of this on the supposed but bogus proposition that the drug would have to clear all of these hurdles with each hurdle reducing the chances in turn. *In fact, the probabilities from the Tufts study were already discounted for all necessary hurdles.* Credit Suisse simply disregarded that and superimposed a manipulation nowhere in the Tufts study to reach a conclusion nowhere in the Tufts study, a conclusion materially at war with actual probabilities stated in the Tufts study (and one which even Credit Suisse's counsel admits was an error).

This order acknowledges that when there are separate probabilities for independent events and both must occur for a particular outcome, it is perfectly correct (under Bayesian probability theory) to multiply them together. For example, the probability of rolling snake eyes, each die having six sides, is one-sixth times one-sixth, which equals one out of 36. The point, however, is that the Tufts study had already done the math, and given bottom-line probabilities of reaching the market for drugs in each of the phases. It was just a clever manipulation by Credit Suisse to further reduce the odds by multiplying them together, or so it is alleged.

This order also acknowledges that the Tufts study had wording that requires interpretation. In that study, one sentence stated (Kruse Exh. 15 at 6) (emphasis added):

> Average success rates (the chances of reaching the market eventually) for new chemical entities are about *20% for those that successfully pass the phase I trials, 30% for those that pass phase II, and 67% for phase III*.

For Phase I and Phase II, the quote stated that the probability was for drugs that "pass" the trials for those phases. At oral argument, plaintiffs' counsel said that the probabilities were for drugs *still in* the phases and not yet having passed the phase. This reading serves to reconcile those phrases with the last phrase, "67% for phase III," but it seems inconsistent with the language actually used for Phase I and Phase II. That said, the Tufts study went on to explain (*ibid.*) (emphasis added):

> *Note that these rates apply as drugs enter each clinical trial* (*e.g.*, about two out of three drugs in phase III trials will eventually reach the market).

Then, in its section on clinical trial costs, the Tufts study listed the "Likelihood of eventual FDA approval," with 20% for Phase I, 30% for Phase II, 67% for Phase III, and 81% for FDA NME. Despite this possible language snafu, it remains clear that chaining together the probabilities, as Credit Suisse did, was an error — but an error that looks too much like a manipulation in light of the probabilities previously calculated by Credit Suisse and the large fee at stake to presume innocence at this pleading stage (Second Amd. Compl. ¶ 166).

The second amended complaint also claims that had the Tufts study's actual probabilities been used, the net present values of Cat-K and ibrutinib would have been materially higher; that is, $73 million and $14 million respectively, rather than the $56 million and the two million dollars that Credit Suisse had used. This would have then translated into an implied per share equity reference range of $8.11– $10.01 (including drug royalty assets), rather than the $7.65–$8.55 range listed in the recommendation statement. The $8.11–$10.01 range would be even higher, according to the second amended complaint, if Credit Suisse's other alleged errors with the misclassification of two Pharmacyclics drugs and the use of a lower-end peak sales estimate for Cat-K were also taken into account (*id.* ¶ 46).

United States District Court
For the Northern District of California

Even so, Credit Suisse argues that the second amended complaint supports a different inference: its misuse of the Tufts study's probabilities was just human error. According to Credit Suisse, that inference arises from the following. In April 2010, Credit Suisse first used a 50–60% probability range in valuating Cat-K, but later increased that range to 60–70% "per [Celera] management guidance"; no valuation of ibrutinib or other Pharmacyclics drugs was done at that time (*id.* ¶ 161; Pollak Exh. 3). Then, in December 2010, Credit Suisse was asked to estimate the value of the Pharmacyclics drugs, for which Celera management had provided no guidance. As a result, Credit Suisse turned to the Tufts study to assess the value of Cat-K *and* the Pharmacyclics drugs. It was at that point that Credit Suisse first erred with the study's probabilities, later repeating the error in detail when it sent e-mails and made presentations to the Celera board. In Credit Suisse's view, it thus "defies common sense that [it] would engage in fraud to undervalue [Celera] and then repeatedly disclose the blueprints for that fraud," especially as its analysis of the Pharmacyclics drugs would have *increased* Celera's value (Opp. 2). Credit Suisse also points to its internal e-mails — in which Page asked for "a [Blackberry] friendly email [of] the probabilities by phase and the cumulative probabilities we use under the Tufts framework" — to show that Credit Suisse simply misunderstood the Tufts study as requiring cumulative probabilities (Second Amd. Compl. ¶ 180).

To be sure, innocent negligence may have caused Credit Suisse's mistakes. But this does not take away from the allegations that Credit Suisse had used the higher average probabilities in valuating Celera's drug royalty assets on several occasions, and then, to extract a large fee from a deal on the verge of collapse, manipulated the data to show lower probabilities. Indeed, there are allegations that in April 2010, Credit Suisse had calculated, and was thus aware of, higher probabilities derived from sixteen studies, the averages of which at least correlated with those provided by the Tufts study (*e.g.*, for Phase III, 60–70% average range encompassed Tufts study's 67%). The second amended complaint thus alleges an inference of scienter that is still cogent and at least as compelling as any opposing

United States District Court
For the Northern District of California

inference, such as the one offered by Credit Suisse. *Tellabs*, 551 U.S. at 324. That is enough at this pleading stage.

Scienter has also been adequately alleged as to Celera and Ordoñez. Specifically, the second amended complaint asserts that Ordoñez received Credit Suisse's valuation of ibrutinib and other Pharmacyclics drugs on December 18, 2010. Among other alleged errors, this valuation relied on the incorrect, cumulative probabilities discussed above. Three days later, Ordoñez e-mailed (*id.* ¶ 38) (emphasis added):

> It looks, from my reading, that the BTK inhibitor [ibrutinib] is zooming by HDAC [histone deacetylase]. According to the RBC report of June 16, 2010, they put the value of [ibrutinib] at $7/share and the HDAC and FVIIa at $2/share each. This is when PCYC [Pharmacyclics] was trading at $6.51/share, with 56 MM shares outstanding. Most other analysts seem to agree and *I don't think CS [Credit Suisse] got the analysis right*. Push back on them. They had listed FVIIa as an anti-coagulant. It's not clear they read th e material you provided. It would seem these drugs will get commercialized in 2014/15, if they are successful.

While the e-mail alone does not establish a strong inference of scienter — as to Credit Suisse's misapplication of the Tufts study's probabilities — the second amended complaint further claims that Ordoñez had access to information relating to these probabilities. As noted above, Credit Suisse had calculated average probabilities from sixteen studies *before* using the Tufts study; for Phase I drugs, the average was 26%, whereas for Phase III drugs, the average was 65% (later changed to a 60–70% range per Celera's guidance). Credit Suisse then presented these average probabilities to Ordoñez and a number of Celera directors *in five different meetings*, before laying before them the erroneous 53% number for Cat-K (*id.* ¶¶ 162, 166, 189). Additionally, one week before her e-mail, Ordoñez received a Roth Capital Partners report that applied a 20% probability for ibrutinib, in contrast to the three percent later used by Credit Suisse (*id.* ¶ 183). While there is no allegation that Ordoñez received the Tufts study itself, she nevertheless had access to information about higher probabilities that correlated with those provided by the Tufts study, the inference being that she was at least deliberately reckless when it came to Credit Suisse's error.

In short, the second amended complaint presents enough "detailed and specific allegations about [Ordoñez's] exposure to factual information within [Celera]," at least as to the Tufts study's probabilities. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). Such allegations can therefore support a strong inference of scienter on Ordoñez's part, especially as she led the acquisition negotiations and stood to gain a senior executive position and a $2.3 million "change-in-control" payment from Quest (Second Amd. Compl. ¶¶ 15, 235). Accordingly, through Ordoñez, scienter has been adequately pled as to Celera.

Even so, Celera and Ordoñez try to downplay the disparity among the different probabilities used for the drug royalty assets. Specifically, they suggest that the difference between a 60–70% probability range and a 53% cumulative probability was not so great as to raise red flags. Not true. The difference between 60–70% and 53% was significant, especially as that difference reportedly led to a $56 million valuation rather than a $73 million valuation for Cat-K. Morever, the 60–70% probability range was shown to Ordoñez in five different meetings, thereby strengthening the inference that she, and therefore Celera, either knew about or were deliberately reckless with the erroneous probabilities.

***(4) Reliance.***

Finally, Credit Suisse, Celera, and Ordoñez argue that amendment is futile because the second amended complaint does not sufficiently allege plaintiffs' reliance on the alleged misrepresentations.

This argument, however, assumes that Section 14(e) requires reliance. Our court of appeals has not stated such a requirement. Nor has any district court in this jurisdiction. To the contrary, "at least two district courts in the Ninth Circuit have held that . . . plaintiffs need not prove reliance in connection with [Section] 14(e)." *See Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1131 (N.D. Cal. 2006) (Judge Phyllis Hamilton); *and Church v. Consol. Freightways, Inc.*, C-90-2290 DLJ, 1991 WL 284083, *9 (N.D. Cal. June 14, 1991) (Judge D. Lowell Jensen). As such, the order is unpersuaded by the out-of-circuit decisions cited by defendants. *See, e.g., Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009).

Accordingly, as to the Section 14(e) claim against Credit Suisse, Celera, and Ordoñez, the motion for leave is **GRANTED**. To the extent that plaintiffs contemplate a Section 14(e) claim against the Celera directors, the motion for leave is **DENIED**.

**B. Fiduciary Duty Claims.**

The second amended complaint also claims breach of fiduciary duty as to the Celera defendants, as well as aiding and abetting of that breach by Credit Suisse. According to defendants, such claims are futile because the second amended complaint does not adequately allege breach of the duty of loyalty.

The order disagrees. The second amended complaint alleges that Credit Suisse presented Cat-K's average probability range to Ordoñez and the Celera directors in several meetings, *before* presenting to them the lower, cumulative probability that Credit Suisse incorrectly calculated from the Tufts study (Second Amd. Compl. ¶ 162). This at least suggests that Ordoñez and the Celera directors may have known about or should have uncovered Credit Suisse's manipulation. As such, the second amended complaint contains enough facts, at least at this pleading stage, to allege claims for breach of fiduciary duty and aiding and abetting of that breach.

**CONCLUSION**

To the extent stated above, the motions for judicial notice are **GRANTED IN PART AND DENIED IN PART**. With regard to the Section 14(e) claim against Credit Suisse, Celera, and Ordoñez, as well as the fiduciary duty claims, the motion for leave is **GRANTED**.

As to the Section 14(e) claim against the Celera directors (other than Ordoñez), the motion for leave is **DENIED**. Plaintiffs were warned "to plead their best case." They were aware of the arguments regarding the making of the alleged misrepresentations, as defendants presented these same arguments before in their prior motions to dismiss. The second amended complaint, however, does not sufficiently allege that these directors made misrepresentations. As such, the second amended complaint will not have a Section 14(e) claim against the Celera directors (other than Ordoñez).

United States District Court
For the Northern District of California

Accordingly, plaintiffs shall file the second amended complaint, in conformity with this order, by **5 PM ON MARCH 14, 2014**. There will be no more attempts to plead. Defendants must then file their answer by **5 PM ON MARCH 28, 2014**. No more motions to dismiss shall be brought. Discovery may proceed effective now. Given that so much discovery has already been done in the Delaware action, counsel have ample time to complete discovery as already set in our case management order and they should not be expecting a postponement.

**IT IS SO ORDERED.**

Dated: March 10, 2014.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE