IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIOTECHNOLOGY VALUE FUND, L.P., BIOTECHNOLOGY VALUE FUND II, L.P., INVESTMENT 10, L.L.C., BVF INVESTMENTS, L.L.C., BVF INC., and BVF X, LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>CELERA CORPORATION, CREDIT SUISSE SECURITIES (USA) LLC, KATHY ORDOÑEZ, RICHARD H. AYERS, WILLIAM G. GREEN, PETER BARTON HUTT, GAIL M. NAUGHTON, WAYNE I. ROE, and BENNETT M. SHAPIRO,<br><br>    Defendants.<br>                                                              / | No. C 13-03248 WHA<br><br>**ORDER RE MOTION TO EXCLUDE PORTIONS OF EXPERT REPORTS** |

## INTRODUCTION

In this action asserting claims under federal securities law and state law, plaintiffs move to exclude portions of defendants' expert reports. That motion is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

The facts of this case are discussed in detail in the Court's previous orders (*see, e.g.*, Dkt. No. 130). In brief, certain former shareholders of defendant Celera Corporation contend that its board and officers allowed Celera to be sold too cheaply and that the recommendation to shareholders used false statements to support the sale.

Plaintiffs are former Celera shareholders. The defendants (remaining in the case) are Celera Corporation, Kathy Ordoñez, its former CEO, and several Celera directors. Defense counsel have retained expert witnesses William Hasler and David Stowell to opine on various matters in this action. In his report, Mr. Hasler, a former Dean of the U.C. Berkeley School of Business, discusses the standards and customs relating to the use of financial advisors in sale transactions. Mr. Stowell, a professor at Northwestern University's business school, discusses damages models in securities cases. Trial is scheduled to begin on February 9, 2015. Defendants' motion for summary judgment is pending.

**ANALYSIS**

No challenge is made to the witnesses' qualifications. Rather, the challenge is made to findings and opinions that purport to tell the jury what actually occurred in our case. Specifically, plaintiffs move to exclude: (1) the entire Hasler report, other than paragraphs 1–8, 18–20, 22, 35–36, 40, 48, 55–57, 64–66, and 97; (2) certain exhibits attached to the Hasler report; (3) paragraphs 10–16, 21–23, 25–39, 47–89, 91, 109, 120–39, 157, 178, 180, and Heading IX of the Stowell report; and (4) testimony by Hasler and Stowell on the subjects covered in those portions of their reports.

Rule 702 governs the admissibility of expert opinions. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The general evidence problem at issue requires consideration of two distinctions. The first distinction is between custom-and-practice evidence versus evidence as to what actually happened in the specific case at hand. Subject to Rule 403, it is usually proper for an expert to explain custom-and-practice to a jury. When, however, it comes to what actually occurred in the specific case at hand, an expert should be allowed to state findings as to what happened *only* as

2

to those specific aspects as to which his specialized knowledge, training, and lab work are critical to the analysis.

For example, a ballistics expert may compare two bullets and tell us the likelihood they were fired through the same barrel. Such testimony is based on the witness' own side-by-side comparison, which in itself requires specialized training. Or, a DNA expert may tell us the probability that a DNA sample came from an accused by personally running the lab-tests and calculating the probability. Or, a physician may tell us a diagnosis based on her actual review of the patient. But where the expert does little more than read depositions and deposition exhibits and other such materials, and then proposes to render findings to the jury as to what happened, we should draw the line and bar such testimony. Here are the reasons:

*First*, when it comes to testimony and other trial-type evidence, our jury system looks to the jury itself to make the critical evaluations as to what actually occurred and what the key actors were thinking or relying on. Juries do this role well and they do not need retained advocates to testify on their respective slants on the evidence. That should be saved for closing argument by counsel. Converting the trial into a question of whose fact-finding "investigator" is more credible is a dangerous idea. The jury itself should be making the findings.

*Second*, retained experts of the type in question have no personal knowledge of what actually happened. They did no lab work. They made no side-by-side comparisons of bullets. Insofar as what actually happened in the specific case at hand, they bring little to the table. They really are just advocates dressed up like sworn specialists.

*Third*, the supposed foundation for such fact-finding investigators is usually, as here, a deposition record. But there are big differences between a deposition record and the trial record. The trial record will include evidence not in the deposition record — and vice versa. In most trials, for example, there are witnesses who were not deposed. Even for trial witnesses who were deposed, the questions posed at trial differ from those posed at depositions. In most depositions, one side only chooses to ask questions, so the deposition story is not the full story. And, there are often documents at trial that contradict the deposition testimony or failures to recall. Those materials may or may not surface in a deposition. In short, the trial record is the record on which

3

the jury decides the facts of what actually occurred and that record will almost always be different and usually more complete than the deposition record.

*Fourth*, much of the deposition record is inadmissible at trial anyway. If a defendant wishes to testify before the jury and be cross-examined there, then that is the American way. But a party may not avoid that opportunity by saying that he will stand on his deposition testimony and send up a friendly forensic advocate to summarize his deposition testimony for the jury. The deposition testimony of a party (and anyone aligned with the party) is self-serving and inadmissible hearsay when offered by the party himself. This is another important reason why the trial record will always differ from the deposition record.

*Fifth*, such experts invariably try to tell the jury whose version is truthful. This is usually done through artful use of the word "understanding," as in "it is my understanding that there is no evidence that" followed by a point on trial. The retained witness, of course, has no personal knowledge of what really occurred and should never be allowed to divine for the jury the truth of what actually occurred or what the mental state of an actor was. It is no answer to say that the expert will do so only when the evidence is undisputed, for this line of argument invariably turns on qualitative judgments as to what is disputed, what the evidence shows and what inferences may (or may not) be drawn from the evidence. It also invariably treats failures to recall by deponents, especially by accused deponents, as equivalent to affirmative proof something did not occur. In truth, a failure to recall often lacks credibility in light of all other circumstances and is just a dodge to avoid an admission. In short, experts should not be vouching for whose fact version is more credible.

Importantly, however, subject to Rule 403, an expert may be allowed to state an opinion on the actual matter in controversy where the opinion clearly identifies what is *assumed* versus what is opinion. For example, an expert might advise the jury that he *assumes* certain points in controversy will be found by the jury in a given way and based on those assumed facts, the expert is of the opinion that the conduct at hand conformed (or did not conform) to custom and practice (or to the applicable standard). This type of hypothetical testimony is often allowed

4

because it assists the jury in recognizing the fact issues (for the jury) versus the opinion issues (ultimately also for the jury but specialized testimony may assist the jury).

Certain portions of the Hasler and Stowell reports do not comply with this acceptable format. Instead, they summarize the facts of the case and provide improper opinions. For example, the Hasler report states:

> Plaintiffs allege that Ordoñez knew Credit Suisse confused phase-to-phase and cumulative probabilities of FDA approvals in the valuation of the drugs in Celera's portfolio. Evidence, however, shows that Ordoñez did not question this calculation until April 2011, when she confronted Credit Suisse about it.

Additionally, the Stowell Report states: "Celera's Board is not responsible for losses attributable to Plaintiffs' decision to significantly increase its investment in Celera stock on or after March 18, 2011, when Celera announced the tender offer at $8.00-per-share"; "it was Plaintiffs' actions, rather than the actions of Celera, that caused a portion of the alleged losses" (Hasler Rep. ¶ 106; Stowell Rep. ¶ 109).

**1. HASLER REPORT.**

The Hasler Report is littered with the expert's summaries of fact witness testimony and opinions on whether there is sufficient evidence of certain occurrences. The Hasler report also impermissibly opines on whether defendants' alleged actions comported with the law. The report begins most of its sections with paragraphs detailing the industry standard for certain conduct. This is what expert testimony should look like. The Hasler report then goes too far in applying these standards of care to the case at hand and enters the realm of the jury.

Paragraphs 18–20, 22, and 35–36 are examples where Mr. Hasler properly lays out an expert opinion of industry standards. After laying out those standards, however, he goes too far, for example: paragraph 21 ("In my review, the evidence does not support these allegations"); paragraph 23 ("I have not seen any evidence . . . that defendant non-employee directors had such conflicts of interest"); paragraph 27 ("it is clear that the directors had a significant personal financial incentive to negotiate for a high price"); paragraph 29 ("Materials I have seen are inconsistent with such a conclusion"); paragraph 33 (Plaintiffs' allegations about Ordoñez's conflict of interests due to her change-in-control payments are not consistent with the facts");

5

paragraph 43 ("Equally misplaced are Plaintiffs' allegations that Ordoñez was conflicted because she was able to sell her 131,409 shares of stock in the merger"); paragraph 54 ("the board did actively oversee the merger process"); paragraph 62 ("Rather than evidencing some shortcomings on Celera's or Ordoñez's part, these efforts to emphasize Celera's expectations and to communicate with Credit Suisse about its work demonstrate good practice by Celera during the sale process").

### 2. STOWELL REPORT.

The Stowell report discusses damages available to plaintiffs in securities fraud cases, including the issue of mitigation of damages. Much of the Stowell report discusses industry standards and rebuts plaintiffs' expert reports, the Saba and Werner reports. Other parts, however, improperly summarize the facts of the case and render opinions on the ultimate issues to be decided by the jury.

For example, the Stowell report states that Celera "should not be held accountable" because "Celera's Board and Credit Suisse conducted a reasonable sale process that led to a reasonable valuation determination, notwithstanding the errors alleged by Plaintiffs." Other examples include the following statements: "the Celera Board properly controlled the M&A process and reasonably trusted and relied upon Credit Suisse and Mr. Boutros (and later Mr. Page) to direct solicitation of an appropriate group of potential buyers, while overseeing this process"; "Credit Suisse's Valuation Process Resulted in a Reasonable Determination of Value for Celera Even Though the Bank Erred in One Part of Its Analysis Concerning Celera's Legacy Drug Assets"; and "Contrary to Plaintiffs' allegations, the Board and its special committee actively oversaw Credit Suisse's effort to secure interested bidders for the entire Company or its component businesses" (Stowell Rep. at ¶¶ 10, 38, 55, Heading IX).

These types of statements simply go too far and invade the province of the jury. Defendants respond that the disputed statements should be allowed in evidence because the expert reports include disclaimers stating that all facts are assumed. Defendants also argue that most of the facts the experts discuss are not disputed. These do not cure the experts' improper opinions.

6

As explained above, the experts will be permitted to testify to industry standards and practices regarding fiduciary duties, conflicts of interests, and the use of financial advisors in the merger process. The experts will not be permitted to testify and render findings on the issue of whether defendants' actual conduct was in compliance with industry standards. These are factual issues for the jury to consider after hearing the evidence at trial. An expert may not vouch for one side's fact scenario and purport to tell the jury what actually occurred. The jury is entitled to hear testimony from individuals who have first-hand knowledge of the events that occurred. At trial, those witnesses will be subject to cross examination and their knowledge and credibility will be tested in the presence of the jury.

## CONCLUSION

Plaintiffs' motion to exclude portions of the Hasler and Showell reports is **GRANTED IN PART AND DENIED IN PART**. The following portions of the Hasler report shall be excluded: paragraphs 13–17, 21, 23–34, 37–39, 41–47, 49–54, 58–63, 67–96, and 98–114, and exhibits attached to the Hasler report titled "No Evidence of Conflicts of Interest for Celera's Non-Employee Directors," "Ordoñez's Change in Control Pay is Not a Conflict of Interest," "Ordoñez's Retention by Quest is Not a Conflict of Interest," "Ordoñez's Stock and Option Holdings Are Not a Conflict of Interest," and "Board Conducted Reasonable Sale Process." The following portions of the Stowell report shall be excluded: the last two bullet points in paragraph 10; paragraphs 11–16, 21–22, 25–39, 47–89, 109, 120–39, 157, 178, 180 and Heading IX.

**IT IS SO ORDERED.**

Dated: January 9, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE